## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JORDAN BROWN, | : | |
| | : | |
| Plaintiff, | : | No.  2: 20-cv-985 |
| | : | |
| v. | : | |
| | : | |
| JANICE WILSON, JEFFREY MARTIN, | : | **JURY TRIAL DEMANDED** |
| ROBERT MCGRAW, TROY | : | |
| STEINHAUSER, FRANK PAWLOWSKI, | : | |
| | : | |
| Defendants. | : | |

## **COMPLAINT**

Plaintiff files this Complaint as follows:

### INTRODUCTION

1.     This case involves the tragic murder and untimely death of Kenzie Houk on February 20, 2009.  This case also involves the wrongful conviction of 11-year-old Jordan Brown ("Jordan") for that murder.  From the outset, the PSP Defendants (defined *infra*) failed to adequately investigate the most likely suspect, Adam Harvey ("Harvey"), Kenzie's long-time abusive boyfriend who had just moved into a home within 10 miles from where she was residing, and who had learned only seven days prior to her death that he was not the biological father of her youngest daughter, AH.  Instead, the PSP Defendants turned their sights on Jordan, her innocent soon-to-be stepson.  They fabricated reports and manufactured evidence against him, culminating in a falsified criminal narrative that stole his entire childhood.  Jordan was exonerated on July 18, 2018.  This case asserts that the PSP Defendants' violated the Fourth and Fourteenth Amendments to the United States Constitution in his right to be free from criminal prosecution without probable cause and his right to due process of law.

## JURISDICTION AND VENUE

2.     This action is brought under the Fourth and Fourteenth Amendments to the United States Constitution pursuant to the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983.  This Court has jurisdiction over these claims under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because each claim arose in Lawrence County in the Western District of Pennsylvania.

## PARTIES

4.     Jordan is an adult individual residing in the Commonwealth of Pennsylvania.[1]

5.     Defendant Janice Wilson ("Wilson") is an adult individual employed as a Trooper with the Pennsylvania State Police ("PSP").  The PSP maintain a principal place of business at 1800 Elmerton Avenue, Harrisburg, Pennsylvania 17110.  At all relevant times, Wilson was acting under color of state law, and in accordance with the policies, customs and/or practices of the PSP. Wilson is sued in her individual capacity.

6.     Defendant Jeffrey Martin ("Martin") is an adult individual employed as a Trooper with the PSP.  The PSP maintain a principal place of business at the above-mentioned location. At all relevant times, Martin was acting under color of state law, and in accordance with the policies, customs and/or practices of the PSP.  Martin is sued in his individual capacity.

7.     Defendant Robert McGraw ("McGraw") is an adult individual employed as a Trooper with the PSP.  The PSP maintain a principal place of business at the above-mentioned location.  At all relevant times, McGraw was acting under color of state law, and in accordance with the policies, customs and/or practices of the PSP.  McGraw is sued in his individual capacity.

---

[1] For clarity, Jordan and Jenessa (defined *infra*), both of whom were minors at the time of the events described herein, are referred to by their first names.

8.    Defendant Troy Steinhauser ("Steinhauser") is an adult individual employed as a Trooper with the PSP.  The PSP maintain a principal place of business at the above-mentioned location.  At all relevant times, Steinhauser was acting under color of state law, and in accordance with the policies, customs and/or practices of the PSP.  Steinhauser is sued in his individual capacity.

9.    Wilson, Martin, McGraw and Steinhauser are referred to as the "PSP Defendants."

10.   Defendant Frank Pawlowski ("Commissioner Pawlowski") is an adult individual formerly employed as the Commissioner of the PSP.  The PSP maintain a principal place of business at the above-mentioned location.  At all relevant times, Commissioner Pawlowski was a policymaker for the PSP.  At all relevant times, Commissioner Pawlowski was acting under color of state law.  At all relevant times, Commissioner Pawlowski acted with deliberate indifference to the consequences of an established policy, practice and/or custom within the PSP to initiate criminal proceedings against citizens in violation of the Fourth and Fourteenth Amendments to the United States Constitution, which directly caused the constitutional violations in this case. Pawlowski is sued in his individual capacity.

## FACTS

### The PSP's Policies, Practices and Procedures regarding Affidavits of Probable Cause

11.   An affidavit of probable cause is a sworn statement generally prepared by law enforcement attesting to facts that support a criminal charge.

12.   An affidavit of probable cause accompanies the criminal complaint that is filed against a person to initiate criminal proceedings against him or her.

13.     Once a criminal complaint is filed with a supporting affidavit of probable cause, a neutral magistrate judge reviews both documents and determines whether probable cause exists to believe the person alleged to have committed the crime in fact committed it.

14.     The probable cause determination is made under the totality of the circumstances.

15.     At all relevant times, the PSP admits that it had an established policy, practice and/or custom under Commissioner Pawlowski through which it does not consider or investigate exculpatory evidence for purposes of preparing an affidavit of probable cause once it decides to criminally charge an individual, even if that evidence would eliminate probable cause to arrest.

16.     According to this established policy, practice and/or custom, the PSP admits that, under Commissioner Pawlowski, the only facts used in an affidavit of probable cause for arrest are those which would support the criminal charges being filed.

17.     According to this established policy, practice and/or custom, the PSP admits that, under Commissioner Pawlowski, exculpatory information is intentionally concealed until after the conclusion of a preliminary hearing[2] and the criminal defendant has been held for court.

18.     As justification for this established policy, practice and/or custom, the PSP admits that, under Commissioner Pawlowski, affidavits of probable cause are prepared with the public in mind, such that they are written for the dual purpose of providing probable cause evidence of the criminal narrative and of the public opinion.

19.     To that end, the established policy, practice and/or custom under Commissioner Pawlowski for affidavits of probable cause is defined by the PSP as the "Four Corners Rule."

---

[2] A preliminary hearing is a court proceeding before a neutral magistrate judge whose purpose is to determine whether the evidence presented provides probable cause to believe that a crime was committed, and that the crime was committed by the criminal defendant.

20.     The Four Corners Rule means that the PSP prepare affidavits of probable cause knowing that a neutral magistrate judge cannot look outside of the four corners of the affidavit when making his or her probable cause determination.

21.     This established policy, practice and/or custom violates citizens' rights under the Fourth Amendment of the United States Constitution, which prohibits a police officer from arresting a citizen except on probable cause, and requires that officer to disclose all material facts in an affidavit of probable cause, including exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists.

22.     This established policy, practice and/or custom violates citizens' rights under the Fourth Amendment of the United States Constitution because the probable cause determination must be based on all the facts that were known to a reasonable arresting officer, and that a reasonable magistrate judge would want to consider, and not only those facts that would support the arrest.

### The PSP's Policies, Practices and Procedures regarding Child Interviews

23.     The PSP's established policy, practice and/or custom on affidavits of probable cause is not only unconstitutional on its face, it also encourages the PSP to intentionally violate other established policies, practices and/or customs, including those relating to criminal investigations.

24.     Specifically, the PSP's established policy, practice and/or custom on affidavits of probable cause encourages members of the PSP to conduct and report witness interviews in a manner not in accordance with accepted standards, and in a way that disregards plainly exculpatory evidence.

25.     In relation to the criminal investigation into Kenzie Houk's death, the PSP, under Commissioner Pawlowski, established the following standards and procedures for interviewing children in criminal investigations about past events:

a.     Establish a rapport with the child (i.e., make the child feel comfortable so that the child feels assured and comfortable),

b.     Ensure that the child understands that he or she is only to talk about things they actually saw, and not what they think may or may not have happened,

c.     Ensure that the child understands each question being asked and to instruct the child to tell the interviewer if he or she does not understand the question,

d.     Avoid the use of questions that are suggestive/leading and that require one-word answers,

e.     Do not repeat questions within an interview because the child will often change their mind to please the interviewer,

f.     Do not repeat interviews; however,

   i.     if interviews must be repeated, the child's answers in the first interview are the most reliable and supersede new or additional facts in a subsequent interview, and

   ii.     if interviews must be repeated, the interviewer must ensure that there is no implicit or explicit pressure on the child to change or add to their reports because the repeated interview may signal to the child that he or she was not previously believed,

g.     Electronically record all interviews because

   i.     research establishes that the interviewer's memories and notes inaccurately reflect the actual interview in that, among other reasons, they do not accurately contain all the questions asked, the wording of the questions asked, and/or the number of times an answer was "I don't know" or "I don't remember,"

   ii.     Electronic recordings are critical to determine the degree to which the standards and procedures were appropriately followed, and

   iii.     Electronic recordings are critical to determine whether all the inculpatory or exculpatory statements of the child are part of the evidence,

h.    Do not use more than one interviewer because the presence of more than one adult in the room alters the atmosphere and pressures the child to say things without regard for truthfulness, and

i.    Always remain neutral and do not use the child to confirm judgments or leads in a criminal investigation.

26.    At all relevant times, the PSP Defendants were aware of and trained on the foregoing standards and procedures in relation to conducting child interviews on behalf of the PSP

27.    The foregoing standards and procedures were established by the PSP to ensure that child interviews yield objectively reliable evidence, and to prevent coaching and rid suggestibility in the child being interviewed.

28.    The foregoing standards and procedures were established because the PSP knew that children tend to look toward cues from the interviewer, and thus suggestive and leading questions may tend to affect memory and recall in the child being interviewed, leading to objectively unreliable (and often false) evidence.

29.    Moreover, the foregoing standards and procedures were established because the PSP knew that, given the increased vulnerability to suggestion in children, when interviewing a child it is particularly important to avoid any method of questioning that would tend to introduce misinformation, and to instead focus on questioning that would tend to elicit reliable information.

30.    As described in greater detail below, although the PSP Defendants were aware of and trained on conducting child interviews according to the foregoing standards and procedures, they also knew that any conduct violative of those standards and procedures would likely go unnoticed because of the established policy, practice and/or custom within the PSP that police officers are not to consider or investigate exculpatory evidence for purposes of preparing an affidavit of probable cause, even if that evidence would vitiate probable cause for the arrest.

### *Factual Background of Kenzie's Death*

31.    Kenzie Houk was found dead on February 20, 2009.

32.    Her body was discovered by her youngest daughter, AH, around 9:30 a.m.

33.    AH was four years old.

34.    At the time of her death, Kenzie Houk resided in a rental home in the Wampum-New Galilee area with Chris Brown, her boyfriend, Jordan, her 11-year-old stepson[3], Jenessa Houk ("Jenessa"), her seven-year-old daughter, and AH.

35.    At the time of her death, Chris Brown had been at work since around 7:00 a.m., while Jordan and Jenessa had left the house for school around 8:12 a.m.

36.    As described in greater detail below,

   a.    A six-person work crew found AH crying at the front door of the rental home sometime after 9:30 a.m.,

   b.    First responders were dispatched around 9:56 a.m.,

   c.    First responders arrived at 10:13 a.m.,

   d.    Kenzie Houk was officially pronounced dead at 10:50 a.m., and

   e.    Jordan was arrested the next morning (February 21, 2009) around 3:00 a.m., only 16 hours after her death

37.    Also, as described in greater detail below, the PSP Defendants failed to adequately investigate Harvey, the most obvious suspect.

38.    Ultimately, the PSP Defendants targeted Jordan, who they knew was innocent.

---

[3] In prior court opinions and appearances, Jordan is referred to as Kenzie Houk's stepson, and Kenzie Houk is referred to as Jordan's stepmom. Although Jordan's father, Chris Brown, was not married to Kenzie Houk, they lived together, and she was eight months pregnant with his child. For consistency, Jordan and Kenzie Houk, when their names are used in connection with any relationship between them, will be referred to as stepson and stepmom, respectively.

39.    No reliable evidence was ever found linking Jordan to Kenzie Houk's murder, and any evidence that was used against him was fabricated by the PSP Defendants.

40.    According to the PSP Defendants' fabricated criminal narrative, in less than 120 seconds, Jordan murdered Kenzie Houk in the following way:

    a.    after getting ready for school, he made numerous trips between the first and second floors just walking around with "his guns,"

    b.    after walking between the floors for a while with his guns, he ultimately decided to come downstairs with a youth 20-gauge shotgun,

    c.    when he got downstairs with the youth 20-gauge shotgun, he entered the first-floor bedroom,

    d.    upon entering the first-floor bedroom, he walked past Kenzie Houk (who was awake) and across the room to retrieve an unused shotgun shell,

    e.    he took the unused shotgun shell and loaded the youth 20-gauge shotgun in the room where Kenzie Houk was awake and present,

    f.    he then walked to the other side of the bedroom where the door was located and positioned himself behind Kenzie Houk,

    g.    upon positioning himself behind Kenzie Houk, he aimed the youth 20-gauge shotgun without notice or struggle from her, and then fired a single execution-style gunshot into the back of her head,

    h.    after Kenzie Houk was dead, he took the shotgun back upstairs where he removed the empty cartridge and put it in his pocket, and then wiped the youth 20-gauge shotgun clean of all fingerprints and trace evidence of the murder and placed it neatly in the corner of room, and

    i.    he then came back downstairs with no blood stains or evidence of the crime on his clothing, and met Jenessa at the back door in the laundry room to walk to the bus as though it was just another day and the murder was simply a matter of routine.

41.    The PSP Defendants knew that not a single fact from their criminal narrative really occurred, and they intentionally fabricated each of those facts.

42.    The only truthful fact within their narrative was the fact that Jordan and Jenessa both got ready for school that morning and caught the bus within 12 minutes time.

### *Detailed Factual Allegations of KenzieHouk's Death and the Ensuing Investigation*

43.    On February 20, 2009, Kenzie Houk woke up Jenessa around 8:00 a.m. to tell her to get ready for school and, in turn, Jenessa woke up Jordan in response to her mother's request.

44.    At that time, both Jenessa and Jordan were sleeping on the second floor of their two-story rental home; however, because Jordan's clothes were in the first-floor bedroom where Kenzie Houk was located, he got ready downstairs while Jenessa got ready upstairs.[4]

45.    After they finished getting ready for school, Jenessa and Jordan waited in the first-floor family room that was immediately adjacent to Kenzie Houk's bedroom, until she told them to go outside to catch their school bus.

46.    Jenessa and Jordan left the house around 8:12 a.m.

47.    At the time that Jenessa and Jordan left for school, Kenzie Houk was awake.

48.    According to their bus driver, Jenessa and Jordan got onto the school bus in accordance with their typical practice and their behavior was completely normal.

49.    AH was still sleeping inside the house.

50.    Around 9:15 a.m., approximately 60 minutes after Jenessa and Jordan got on the bus to go to school, a six-person work crew from a tree service company arrived at the premises to finish collecting firewood from the day before.

---

[4] Jordan was in the process of switching rooms with Kenzie Houk and Chris Brown so that those two had more room for a nursery for their soon-to-be-born child on the second floor. On the date of her death, Kenzie Houk was eight months pregnant with Chris Brown's child. On the date of her death, all of Jordan's clothes had been moved to the first-floor bedroom, but the parties were still sleeping in their same bedrooms.

51.    According to the work crew, around 9:40 a.m., almost one and a half hours after Jordan and Jenessa got on the bus to go to school, AH appeared at the screen door to the front of the house, and she was crying.

52.    According to one of the members of the work crew, approximately 10 minutes before AH appeared at the screen door (or, around 9:30 a.m.), he heard a little girl crying inside the home.

53.    Upon seeing AH at the screen door, some of the members of the work crew approached her, at which time she told them that her mother was dead.

54.    In response, at least one of the members of the work crew looked through the screen door into the house and saw Kenzie Houk's body.

55.    He immediately called the owner of the property, and then 911.

56.    At all relevant times, AH was coherent and able to appropriately communicate.

57.    The PSP first dispatched troopers to the home around 9:56 a.m.

58.    Troopers Harry Gustafson ("Gustafson") and Jeremy Bowser ("Bowser") initially arrived at the home around 10:13 a.m.

59.    Upon entering the home, Gustafson encountered AH, who remained coherent and able to appropriately communicate, so he took her into the home and placed her on the couch to watch television while he looked around.

60.    Shortly thereafter, Gustafson and Bowser saw Kenzie Houk's body on the bed of the first-floor bedroom with a very large pool of blood by her head and upper shoulders.

61.    There was no blood below Kenzie Houk's shoulders.

62.    Kenzie Houk was obviously deceased.

63.     Nevertheless, despite a significant passing of time since the emergency dispatch call, and the fact that she was obviously deceased, Gustafson and Bowser initiated emergency resuscitation efforts, thereby forcibly and intentionally moving and touching Kenzie Houk's body from the position in which she was originally found.

64.     Gustafson and Bowser's resuscitation efforts contaminated the crime scene area in the first-floor bedroom where Kenzie Houk's body was located.

65.     Moreover, during the performance of these resuscitative efforts, Gustafson became sick, ran through other parts of the crime scene (leaving blood contaminates on the only door in the house that was used for ingress and egress), and vomited.

66.     The paramedics, forensic pathologist (Dr. James Smith ("Dr. Smith")) and coroner (Richard Johnson ("Johnson")) arrived around 10:50 a.m.

67.     By the time they arrived, the crime scene inside the home was fully contaminated, and no perimeter had been established outside the home.

68.     Because no perimeter had been established, the arrival of subsequent paramedics, forensic pathologists, coroners, investigators, family members and others destroyed all potential evidence of tire tracks and footprints outside the home.

69.     Dr. Smith and Johnson noted a gunshot wound to the back of Kenzie Houk's head, as well as the absence of any signs of life from the unborn fetus.

70.     Dr. Smith and Johnson noted that Kenzie Houk's body was still warm to the touch and that there were no signs of the early stages of rigor mortis, indicating that the death must have occurred sometime after 9:00 a.m.

71.     Kenzie Houk and her unborn fetus were pronounced dead shortly thereafter.

72.    The PSP Defendants interviewed several of Kenzie Houk's family members and friends within hours of her death, asking each of them whether they knew anyone who may have committed this apparent murder.

73.    Among others, Kenzie Houk's parents (Deborah and Jack Houk), Chris Brown, her sister and brother-in-law (Jennifer and Jason Kraner), and her close friend (Heather Anzalone), all stated that only Harvey could have committed this murder.

74.    Coincidentally, as described in greater detail below, in the First JB Interview (defined *infra*), Jordan stated that he saw a black pickup truck on the property when he and Jenessa were walking to catch the school bus that morning.

75.    At the time of his statement, Jordan did not know who Harvey was, nor did he know that Harvey actually drove a black pickup truck.

76.    Harvey is Kenzie Houk's former boyfriend with a long and well documented history of physically abusing her and threatening the lives of both her and her family, including during an altercation with her parents less than 12 hours before her murder.

77.    For example, on May 30, 2006, Kenzie Houk obtained a court-issued protection from abuse order against Harvey (the "First PFA Order").

78.    In the First PFA Order, AH is identified as Harvey's biological daughter (as discussed in greater detail below, seven days before Kenzie Houk was murdered, Harvey learned that AH was not his daughter), and the relationship between Kenzie Houk and Harvey is described, in part, as their being the parents of AH.

79.     According to the First PFA Order, Kenzie Houk suffered prior incidents of abuse from Harvey, including his "threatening to kill [her] or have [her] killed by his friends in Hillsville."[5]

80.     Also, according to the First PFA Order, Harvey physically attacked Kenzie Houk on May 25, 2006 and then, along with his brother, threatened to kill her.

81.     On March 24, 2008, Kenzie Houk obtained another court-issued protection from abuse order against Harvey (the "Second PFA Order").

82.     In between the issuance of the First and Second PFA Orders, Harvey and Kenzie Houk moved together to North Carolina.

83.     Also, in between the issuance of the First and Second PFA Orders, according to Kenzie Houk, Harvey began to obtain firearms.

84.     According to the Second PFA Order, Harvey was not only prohibited for a period of three years from having any contact with Kenzie Houk, but also with her mother, father, sister, and brother-in-law, all of whom he had physically threatened.

85.     The Second PFA Order issued because of the ongoing physical abuse that Harvey committed against Kenzie Houk, as well as his ongoing death threats against her and her family.

86.     The Second PFA Order again listed AH as Harvey's minor child with Kenzie Houk.

87.     Numerous physical assaults by Harvey against Kenzie Houk caused her to move back to the Wampum-New Galilee area with her two minor children (i.e., AH and Jenessa) from North Carolina, while Harvey stayed in North Carolina.

88.     Harvey eventually moved back to the Wampum-New Galilee area in late October 2008, approximately four months prior to Kenzie Houk's death.

---

[5] The Klingensmith family, identified below, were Harvey's "friends in Hillsville."

89.    Upon returning to the New Castle area, Harvey learned that Kenzie Houk was pregnant with Chris Brown's child and he began staying at a home less than 10 miles from the home at which she was residing.

90.    On February 13, 2009, seven days preceding Kenzie Houk's death, Harvey learned through the results of a paternity test that he was not AH's biological father.

91.    In the evening on February 19, 2009, less than 12 hours before Kenzie Houk's death, Harvey confronted her parents at a community club where he had gone to pick up food, resulting in his ejection from the club.

92.    In the months preceding Kenzie Houk's death, Harvey had left countless voicemails on Deborah Houk's phone threatening Kenzie Houk's life and the lives of her family.

93.    As stated above, all of Kenzie Houk's family members and friends told the PSP Defendants that only Harvey could have committed this crime; in contrast; not a single family member or friend stated that Jordan could have done it.

94.    Every family member and friend described the loving relationship among Jordan, Kenzie Houk, Jenessa, and AH.

95.    To find Harvey, the PSP Defendants dispatched one of their colleagues, Trooper Dominick Caimona ("Caimona"), because Harvey was said to be staying with the Klingensmiths (i.e., the "friends in Hillsville"), a family with whom Caimona was friends.

96.    The PSP Defendants assigned Caimona to find Harvey because of his personal and friendly relationship with the Klingensmiths.

97.    In the early afternoon on February 20, 2009, Caimona accompanied Harvey to the PSP barracks without incident, at which time he was questioned over his whereabouts the past 24 hours, as well as his relationship with Kenzie Houk.

98.     Harvey stopped the interview and requested a lawyer.

99.     Ultimately, Harvey proffered an alibi that he was at his parents' home the night before and had stayed through the morning when Kenzie Houk would have been murdered.

100.    This interview was not recorded.

101.    Harvey was never questioned about the First or Second PFA Orders, or about the findings of the paternity test concerning AH, even though the PSP Defendants were aware of both.

102.    Harvey was never questioned about the threatening voicemails that he left on Deborah Houk's phone, even though the PSP Defendants were aware of them.

103.    Harvey's father subsequently supported his alibi.

104.    The PSP Defendants immediately accepted Harvey's father's confirmation of his alibi, even though they knew that he had not seen or talked to Harvey that morning.

105.    Harvey's father's interview was not recorded.

106.    The PSP abruptly stopped investigating Harvey.

107.    When the PSP Defendants' investigation into Harvey as a criminal suspect ended, they had collected soil samples from his truck that were never tested, and they had obtained highway video surveillance that was never watched.

108.    Harvey was never interviewed again.

109.    Instead, the PSP Defendants turned their investigative efforts to Jordan.

### *Evidence of Falsified Reports by the PSP Defendants*

110.    At all relevant times, the PSP Defendants agreed to target and criminally charge Jordan by intentionally falsifying and fabricating evidence against him.

111.    To that end, the PSP Defendants intentionally falsified criminal reports against Jordan to create a bogus narrative that they believed would support criminal charges against him.

16

112.    By way of example, on March 26, 2009, Martin interviewed Chris Brown's ex-girlfriend, Laura Miller (the "Miller Interview").

113.    Chris Brown dated Laura Miller from July 2000 through November 2007.

114.    Martin interviewed Laura Miller so that he and the PSP Defendants could devise a false criminal narrative that Jordan was historically psychopathic—i.e., that Jordan was a murder.

115.    The Miller Interview was recorded, and Martin subsequently prepared a homicide investigation action report based on the interview.

116.    The other PSP Defendants assisted Martin with the homicide investigation action report following the Miller Interview.

117.    The *recorded transcript* of the Miller Interview states, in relevant part:

Q: How did Frank & Jordan get along?
A: Like brothers. They bickered amongst each other a little bit but for the most part they got along. They always stuck up for each other & called each other brothers.

Q: Was Jordan jealous of Frank?
A: A little, but mostly it was an affection thing. Frank was just more of a climbing all over you kind of kid & he was almost a year & a half younger. Jordan didn't like climbing all over everyone unless another kid was doing it. Then he would just come over to do the same thing as Frank & say 'Do that to me too', whether hugs or kissed or tickling or just playing around. He just wanted to be treated the same as everyone else.

Q: Did Jordan act out violently?
A: Mostly he just cried.

***

Q: How did Jordan get along with other kids?
A: He was shy if he was by himself. When Jordan and Frank were together they were never afraid to meet other kids, but when they were alone they were shy. Jordan would just sit back & blush, [sic] We would have to coax him a little to approach other kids, it was kind of cute.

Q: How did you get along with Jordan? Were you afraid of him?
A: Jordan called me mommy for more than six years. We loved each other. No I was not ever afraid of him.

***

Q: What kind of fight?
A: One time Jordan punched Frank & bit himself to get Frank in trouble. That was when he was 5, and only once….

***

Q: Were you ever afraid of Jordan?
A: Absolutely not.
Q: Was Frank[?]
A: No. Frank loved him like a brother. He still does….

118.    The *homicide investigation action report* of the Miller Interview, however, which

was prepared collectively by the PSP Defendants, states the following:

I [i.e., Martin] asked MILLER to come to the barracks for an interview and provide background information on Jordan. MILLER was reluctant to speak with me and asked that information gleaned from this interview not be used against Jordan. MILLER stated that she is fearful of Jordan BROWN.

… She stated that during the seven years she dated Chris [Brown] she came to know Jordan very well and make the following observations of him:

… Jordan cried a lot when he was very young. He was shy, withdrawn and jealous over his dad. During the time I knew him he lied a lot, even when caught he would continue to lie. I remember on one occasion in 2002. My son Frank was playing his toy xylophone and Jordan told him to quit. I told Jordan that he was just playing and that he could continue playing. Jordan was sitting on his dad's lap punching his fist and his open hand together. Sometime later Jordan got up and ran back into the bedroom and punched Frank in the face. Jordan then bit his own arm and said that Frank had bit him….

Jordan never seemed truly happy….

Chris wanted a baby and I told him no way. I bet he was excited about the baby and that probably had Jordan upset. Jordan needed to learn how to deal with his emotions.

I remember one time when Chris had found some mice in the trailer. He put the mice in a bucket and went outside the trailer. When I saw them Chris was throwing firecrackers in the bucket and both he and Jordan were laughing. My son Frank was also with them but he was crying.

….Towards the end of our relationship Jordan would come and he always seemed dirty. He never had any respect for anything. If I put new clothes on him he wouldn't care if he ruined them or got them dirty.

MILLER had no further information and reiterated that she didn't want to become involved in this case and was just trying to help this officer understand the background of Jordan BROWN.

### *The PSP Defendants' Improper and Suggestive Child Interviews*

119.    As stated above, the PSP adopted policies and practices setting forth the following

standards and procedures for interviewing children about past events:

a.    Establish a rapport with the child (i.e., make the child feel comfortable so that the child feels assured and comfortable),

b.    Ensure that the child understands that he or she is only to talk about things they actually saw, and not what they think may or may not have happened,

c.    Ensure that the child understands each question being asked and to instruct the child to tell the interviewer if he or she does not understand the question,

d.    Avoid the use of questions that are suggestive/leading and that require one-word answers,

e.    Do not repeat questions within an interview because the child will often change their mind to please the interviewer,

f.    Do not repeat interviews; however,

i.    if interviews must be repeated, the child's answers in the first interview are the most reliable and supersede new or additional facts in a subsequent interview, and

ii.    if interviews must be repeated, the interviewer must ensure that there is no implicit or explicit pressure on the child to change or add to their reports because the repeated interview may signal to the child that he or she was not previously believed,

g.    Electronically record all interviews because

i.    research establishes that the interviewer's memories and notes inaccurately reflect the actual interview in that, among other reasons, they do not accurately contain all the questions asked, the

          wording of the questions asked, and/or the number of times an answer was "I don't know" or "I don't remember,"

    ii.    Electronic recordings are critical to determine the degree to which the standards and procedures were appropriately followed, and

    iii.    Electronic recordings are critical to determine whether all the inculpatory or exculpatory statements of the child are part of the evidence,

    h.    Do not use more than one interviewer because the presence of more than one adult in the room alters the atmosphere and pressures the child to say things without regard for truthfulness, and

    i.    Always remain neutral and do not use the child to confirm judgments or leads in a criminal investigation.

120.    At all relevant times, the PSP Defendants were aware of and trained on these standards and procedures in relation to conducting child interviews on behalf of the PSP.

121.    At all relevant times while interviewing Jordan, Jenessa, and AH, the PSP Defendants intentionally violated these standards and procedures so that they could prepare a criminal narrative against Jordan that would establish probable cause and win the public opinion.

122.    The first child interview conducted by the PSP was the interview of AH.

123.    This interview was conducted by Wilson shortly after AH found Kenzie Houk's body.

124.    During that interview, AH stated to Wilson that she woke up to a loud noise.[6]

125.    Wilson knew that the murder occurred after Jordan and Jenessa had left for school.

---

[6] According to AH, who spoke during an interview with ABC 20/20 in late 2018:

    the gunshot was what had woken me up. I was so young I didn't know what the sound was. I was just going to walk in to wake her up and her phone rang and I went and answered the phone and I was like 'Hi,' and they were like, 'can I talk to your momma.' I went in to wake her up and her face was facing me and I was just like, 'hey mom, wake up,' and when I turned her over I realized. So I hung up the phone and I went outside. I just sat there and cried with my little blanket.

126.    Wilson subsequently told this information to the other PSP Defendants (as discussed in greater detail below, however, the PSP Defendants ultimately used this fact to falsify the Third and Fourth JH Interviews (defined *infra*)).

127.    This interview was not recorded.

128.    Although AH was coherent and intelligibly communicating at that time, Wilson falsified reports days later, stating that AH was "in a state of shock" and thus unable to provide coherent answers to her questions during the interview.

129.    Following her interview with AH, Wilson interviewed Jenessa at Mohawk Elementary School at 11:50 a.m. (the "First JH Interview").

130.    According to the First JH Interview, Jenessa stated, in relevant part:

> Mommy calls me; I get Jordan up, and my Mommy goes back to bed. We got ready for school by ourselves. We were sitting in the living room and Mommy said, 'Go down to the bus, you're going to be late.' Her door was open; she was laying in bed. We went out to the bus.

131.    According to the First JH Interview, Jenessa responded to questions concerning her recollection of the morning of February 20, 2009, in relevant part, as follows:

> When asked if she saw Daddy that morning, Jenessa stated that she did not. He was gone before she got up. When asked if she saw anyone else at the house that morning, (besides her mother, Jordan, and [AH]), Jenessa stated that no one else was there.

> When asked if [AH] was awake yet when she and Jordan left, Jenessa stated that [AH] was still sleeping.

> Reporting officer asked Jenessa if they had to wait for the bus when they got to the end of the lane, and she stated that the bus was coming, and they had to run part of the way down the lane in order to catch it.

> When asked if she had any other contact with her mother that morning, Jenessa said 'no.' In response to questions, she stated that she and Jordan eat breakfast at school; and that she did not go in and kiss her mother good-bye.

When asked if she had seen or heard anything else unusual that morning, Jenessa stated 'no.'…

132.    The First JH Interview was not recorded.

133.    The First JH Interview was exculpatory.

134.    After concluding the First JH Interview, Wilson then interviewed Jordan at school around 12:10 p.m. (the "First JB Interview").

135.    The First JB Interview took place within minutes of Jordan being awoken by the school nurse and, at the time of this Interview, his eyes were still adjusting to the light.

136.    According to the First JB Interview, Jordan stated, in relevant part:

Reporting officer asked BROWN who all was present in the house, and he stated that it was himself, his mom, and his two sisters; his dad was gone to work. He stated that his Mom was lying in bed watching TV.

BROWN stated that he went downstairs and got his clothes, went to the bathroom and got dressed. BROWN advised that he was switching bedrooms with his mom and dad, because of the baby. His clothes were already in the downstairs bedroom, but he was still sleeping upstairs. He stated they were going to move the beds that week-end [sic].

BROWN stated that he and Jenessa were sitting in the living room. He heard his mom's cell phone shut, and thought she must have checked the time. He stated that she said, "You guys better go." And he said, "Okay."

When asked what time it was, BROWN stated that they usually leave the house at 8:12, but since his mom was telling them they needed to go or they were going to be late, he stated that it was probably 8:13 or 8:14.

Reporting officer asked BROWN if he had seen anyone else or any vehicles at his house. He stated that his mom's green van was there; that she uses it to drive [AH] to school. BROWN stated that he saw a black truck up by the garage, and that he thought it might have been somebody feeding the cows….

137.    The First JB Interview was not recorded.

138.    The First JB Interview was exculpatory.

139.    Although the First JH Interview and the First JB Interview were exculpatory, and although the PSP Defendants learned no new information concerning the minor children, Jenessa was interviewed a second time (the "Second JH Interview").

140.    The Second JH Interview was initiated by Troopers David Bayer ("Bayer") and John Ludwig ("Ludwig") around 8:40 p.m., with the express purpose of adding facts to her pervious statement to Wilson.

141.    Specifically, the PSP Defendants knew they needed to create a window of time in which the murder could be said to have been committed by Jordan.

142.    The Second JH Interview stated, in relevant part:

JANESSA [sic] HOUK was asked when and how she awoke on this date prior to catching her bus for school. She related that she didn't know the exact time but knew that it was sometime before 8:00 A.M. because that is when the bus comes. She explained that her mother woke her up by yelling upstairs. Both she and her stepbrother, Jordan BROWN, got up at that time and started to get ready for school. After getting ready, she proceeded downstairs and sat in the livingroom [sic] of the residence waiting until it was time to walk down to the end of the driveway to catch the bus….

143.    Bayer and Ludwig introduced false facts into the Second JH Interview concerning a brief moment in which Jordan was not visible to Jenessa.

144.    Nevertheless, the Second JH Interview was exculpatory.

145.    The Second JH Interview was not recorded.

146.    After the Second JH Interview, around 10:00 p.m., it was reported to the PSP Defendants that six "long guns" were located by Troopers Andrew Pannelle ("Pannelle") and Markilinski ("Markilinski") in the second-floor bedroom of the home in which Jordan slept.

147.    The long guns were covered by an orange blanket and had been neatly placed in the corner of the bedroom between a dresser and the wall.

148.    None of the long guns were loaded.

149.    Among them was a youth model 20-gauge shotgun.

150.    After learning information about the youth model 20-gauge shotgun, the PSP Defendants, without learning any other information, agreed that they would create a criminal narrative that Jordan murdered Kenzie Houk using that gun, regardless of the truthfulness of that narrative.

151.    After reaching this agreement, the PSP Defendants also agreed that the children—Jordan, Jenessa and AH—were the most susceptible and vulnerable to fabricating evidence, and so they agreed to use the ages of the children against Jordan.

152.    To carry out their agreement, the PSP Defendants agreed that they first needed to establish Jordan's ownership of the youth 20-gauge shotgun by coercing a new statement from him, while manipulating and discrediting the First JB Interview.

153.    The PSP Defendants agreed that they could use the facts that they improperly introduced during the Second JH Interview, coupled with Jordan's ownership of the youth 20-gauge shotgun, to create a false criminal narrative of means and opportunity.

154.    Sometime after 10:00 p.m. on February 20, 2009, Wilson and McGraw interviewed Jordan a second time (the "Second JB Interview").

155.    The Second JB Interview was not recorded.

156.    The Second JB Interview was conducted at Jordan's grandmother's house.

157.    Immediately prior to initiating the Second JB Interview, Wilson and McGraw forced Chris Brown to tell Jordan in their presence that Kenzie Houk was dead.

158.    Wilson and McGraw then initiated the Second JB Interview within minutes of Jordan learning, for the first time, that Kenzie Houk was dead.

159.    Jordan cried during the entire interview.

160.    After eliciting information from Jordan about the youth 20-gauge shotgun, Wilson and McGraw attempted to coerce a false confession from him on the spot, beginning with asking whether he shot that gun that morning (to which Jordan responded, "no").

161.    Chris Brown immediately stopped the interview.

162.    In a private conversation immediately following the above exchange, Wilson and McGraw told Chris Brown that his son murdered Kenzie Houk.

163.    Chris Brown stated that he wanted to speak with his attorney.

164.    The Second JB Interview concluded immediately thereafter.

165.    After the Second JB Interview concluded, Wilson and McGraw persuaded the Houk family to bring Jenessa to the PSP New Castle Barracks for another interview by telling them that they were "100 percent certain that Jordan murdered Kenzie" (the "Third JH Interview").

166.    The Third JH Interview began at 11:30 p.m. on February 20, 2009.

167.    The Third JH Interview lasted approximately 45 minutes, during which time Wilson and McGraw asked leading questions, introduced facts that only they knew from other interviews, and manipulated memories belonging to Jenessa.

168.    During the Third JH Interview, Wilson and McGraw sought to coerce statements from Jenessa tending to prove Jordan's guilt for a crime that he did not commit.

169.    The PSP Defendants agreed that they would use the Third JH Interview regardless of its truthfulness, inconsistencies and/or contradictions.

170.    The PSP Defendants agreed that they needed to coerce and manipulate a statement from Jenessa that included facts demonstrating that Jordan exercised control over *his* guns on the morning of February 20, 2009.

171.    The PSP Defendants also agreed that they needed to incorporate AH's previous statement about the loud noise into Jenessa's statement.

172.    The sole purpose of the Third JH Interview was to fabricate evidence against Jordan that could be used in the Affidavit of Probable Cause (defined *infra*).

173.    The Third JH Interview contained, but was not limited to, the following falsehoods, inconsistencies, and contradictions, of which Wilson and McGraw (and the other PSP Defendants) were aware:

> a.    that Jenessa stated that after she got dressed, she was sitting downstairs in the living room when Jordan came down "carrying his two guns," even though, according to her prior two interviews, Jordan got dressed downstairs and never went back upstairs,

> b.    that Jenessa stated that, when she asked Jordan what he was doing with the two guns, he responded that his dad told him to bring them downstairs, even though it was confirmed at the time of this interview that Chris Brown was already at work that morning,

> c.    that Jenessa stated that Jordan took both guns back upstairs before coming back downstairs and leaving for school, meaning that there would have been no guns on the first floor of the home at the time that Jordan apparently murdered Kenzie, and

> d.    that Jenessa stated that, after her mother told them to go to the bus, Jordan went back into her room to get socks and, while she was waiting in the laundry room, she heard a "big boom" before Jordan came out and they went to the bus.

174.    In the Third JH Interview, Wilson and McGraw introduced to Jenessa the fact that the sound guns make when fired is a "big boom."

175.    The Third JH Interview concluded around 12:16 a.m. on February 21, 2009, at which time Wilson and McGraw demanded that Jenessa provide a fourth interview so that she could repeat the same information into a recording device (the "Fourth JH Interview").

176.    In between the Third and Fourth JH Interviews, Wilson and McGraw rehearsed with Jenessa the key inculpatory facts they wanted her to state against Jordan.

177.    By that time, the PSP Defendants had carefully crafted a false criminal narrative that Jordan had the means and opportunity to murder Kenzie Houk, and that he in fact committed the murder.

178.    At the time of the Fourth JH Interview, Jenessa, who was seven-years-old, had been awake for almost 16 straight hours, had been interviewed three previous times by the PSP Defendants, had never before been recorded, had been transported to multiple locations for care, maintenance and interviews, and had learned that her mother was dead earlier that day.

179.    The Fourth JH Interview contains additional falsehoods, inconsistencies, and contradictions, of which Wilson and McGraw (and the other PSP Defendants) were aware, and states, in full:

> **Tpr. WILSON:** Okay, Janessa [sic], you know that we're recording this right now, right? And it is—do you have the time?
>
> **Jenny KRANER:** Um…12:16.
>
> **Tpr. WILSON:** It is 12:16 on Feb. 21st, and you're here with who? Can you say that for the tape? Tell—tell, who are you here with? Who's this?
>
> **Jenessa HOUK:** Jenny.
>
> **Tpr. WILSON:** And she's?
>
> **HOUK:** Jason. She's my aunt, and Jason's my uncle.
>
> **Tpr. WILSON:** Okay. And we were talking earlier and you explained to us what you heard happening this morning, and what you saw happening, and we would like you to tell us those same things again so we can have it recorded on our tape player. Okay? Is that alright? Alright, let's do the same as we did before, and start at the beginning and you tell us what's the first thing you remember this morning?
>
> **HOUK:** Um, that we got up and I woke him up.

**Tpr. WILSON:** How did you get up?

**HOUK:** Um, my mom yelled up the stairs and I said 'okay.' Then, then, then I went in and woke Jordan up. Then we went downstairs and I got dressed. Then he got his clothes and he went in the bathroom, and then he got dressed. Then, then, then like, about like five minutes after that, my mom said—I was by the door and he was getting his socks on. My mom said um (pause) he went upstairs and got the guns, then he came downstairs.

**Tpr. WILSON:** Just a second. Your mom said he went upstairs and got the guns, or you're telling us that you saw it?

**HOUK:** No, no, I, I messed up. I messed up. (**WILSON:** Okay; **McGRAW:** Okay) So he went up to—he went—my dad said that he went up—my dad told him to go up and get the guns and bring them down, but he put 'em, brang 'em back up, and then he got his socks on. My mom said, "You better go." And then, and then, he was still in there gettin' his socks on and then I went and got my shoes on, and then I was standing there and I heard a big boom. And I don't—he, then he asked me—and I asked him what it was and he didn't; he didn't tell me. So then we went down to the bus stop.

**Tpr. WILSON:** Okay, when you heard the big boom, could you see Jason [**HOUK** *laughing*]—er—Jordan?

**HOUK:** No.

**Tpr. WILSON:** No. He came in the room after that?

**HOUK:** Yeah.

**Tpr. WILSON:** Okay, and just so we have it clear—'cause it got—I'm a little bit confused again. Tell me about the guns.

**HOUK:** He went up and got 'em, then he brung 'em back down. Then he went up again and put 'em back upstairs, and then he came down, got his socks on; then he came—I was already ready; then, then, before he came to get his shoes on I heard a big boom and I didn't know what it was. And I came—he came in here, and I was like 'Jordan, what was that? What was that noise?' and he said, "I don't know what was it—what it was, so then we went—then I and Jordan—we went down to the driveway.

**Tpr. McGRAW:** Jenessa [sic], a little bit ago when, when Jan [i.e. WILSON] wasn't in here what did you say that big boom sounded like?

**HOUK:** A gun.

**Tpr. McGRAW:** Okay, and and how do you know what a gun sounds like?

**HOUK:** Because I've heard a gun before.

**Tpr. McGRAW:** How—where have you heard a gun before?

**HOUK:** When my dad and my mom—when my dad and my brother were shootin' outside.

**Tpr. McGRAW:** Okay.

**Tpr. WILSON:** I think we've covered everything. Is there anything else you think we should know or anything else you can remember that happened this morning?

**Jenny KRANER:** Anything you remember?

**HOUK:** No.

**Tpr. WILSON:** Okay, thank you very much. We're going to stop the tape.

180.    As discussed in greater detail below, the Fourth JH Interview provided the sole basis for the Affidavit of Probable Cause that the PSP Defendants used to support the Criminal Charges and initiate criminal proceedings against Jordan.

### *The Criminal Proceedings*

181.    Jordan was ultimately charged with criminal homicide and criminal homicide of an unborn child at Police Criminal Complaint, Docket Number CR-0000046-09 (the "Criminal Charges").

182.    The PSP Defendants arrested Jordan around 3:00 a.m. on February 21, 2009.

183.    His arrest occurred just three hours after the Fourth JH Interview concluded.

184.    His arrest occurred just 18 hours following Kenzie Houk's death.

185.    He was 11 years old.

186.    His incarceration began by being housed in solitary confinement in an adult facility because of the inherent dangers associated with a child being incarcerated with adult men.

187. While in solitary confinement, Jordan was only allowed to leave his cell for one hour per day and was placed into a small bright-white cell with constantly glaring lighting.

188. The Criminal Charges were based on an affidavit of probable cause that was duly sworn to by Martin and Steinhauser, and which the other PSP Defendants helped prepare (the "Affidavit of Probable Cause").

189. This Affidavit of Probable Cause was written in accordance with the policies, practices and/or customs that were established under Commissioner Pawlowski and described more fully above.

190. At the time the PSP Defendants prepared the Affidavit of Probable Cause, they knew their investigation conclusively established the following facts:

  a. that the First and Second JH Interviews exculpated Jordan,

  b. that the First and Second JB Interviews exculpated Jordan,

  c. that the PSP Defendants coerced and falsified the Third and Fourth JH Interviews to inculpate Jordan intentionally and wrongfully,

  d. that AH—and not Jenessa—reported waking up to a loud noise on February 20, 2009, and then found Kenzie's body sometime after 9:15 a.m.,

  e. that, at the time AH found Kenzie's body, Jordan and Jenessa had left for school over one hour and 15 minutes earlier,

  f. that the youth 20-gauge shotgun alleged to have been the murder weapon contained no trace evidence of the crime, and thus excluded the possibility that it was the murder weapon,

  g. that no reliable evidence linked the youth 20-gauge shotgun to it being the murder weapon, and

  h. that the location at which the youth 20-gauge shotgun was found in the home excluded the possibility that it was the murder weapon.

191.    When the PSP Defendants initiated the Criminal Charges and prepared the Affidavit of Probable Cause, they knew that they had intentionally coerced and falsified the Third and Fourth JH Interviews.

192.    When the PSP Defendants initiated the Criminal Charges and prepared the Affidavit of Probable Cause, they knew the Third and Fourth JH Interviews violated every policy within the PSP on interviewing children.

193.    Nevertheless, the PSP Defendants prepared the Affidavit of Probable Cause with at least the following material falsehoods and omissions:

a.    it omitted the fact that AH discovered Kenzie Houk's body immediately after being woken up from the sound of an apparent gunshot,

b.    it omitted the fact that AH discovered Kenzie Houk's body sometime after 9:00 a.m.,

c.    it omitted the fact that, when AH discovered Kenzie Houk's body, Jordan and Jenessa had left for school at least 45 minutes earlier,

d.    it omitted the fact that AH was always coherent and able to appropriately communicate with the PSP Defendants and others,

e.    it omitted the fact that one of the tree cutters reported hearing a little girl screaming inside the home about 10 minutes after the work crew arrived,

f.    it omitted the fact that, 20 to 30 minutes after a tree cutter heard a little girl screaming inside the home, AH came out of the house screaming, stating that her mother was dead,

g.    it omitted the fact that the 20-gauge shotgun was found alongside five other long-guns on the second floor of the home, and that all were partially covered and neatly stacked in a corner,

h.    it omitted the fact that the First JB Interview exculpated himself and corroborated the First JH Interview in its entirety,

i.    it omitted the fact that, in the First JB Interview, Jordan stated that he saw a black pickup truck on the premises when he was walking to the school bus and that, unbeknownst to Jordan, Harvey drove a black pickup truck,

j.      it omitted the fact that Kenzie Houk's family and friends all stated that only Harvey could have committed this murder,

k.      it omitted all information relating to Harvey,

l.      it omitted all information relating to the PSP Defendants' investigation into Harvey,

m.      it omitted the fact that the First and Second JB Interviews, as well as the First and Second JH Interviews, exculpated Jordan,

n.      it omitted the fact that the Third and Fourth JH Interviews included statements relating to facts that were introduced to her by the PSP Defendants and were not personally observed or understood by her, and that the those interviews contained numerous inconsistencies and contradictions, making it obviously unreliable,

o.      it omitted all facts demonstrating that the youth 20-gauge shotgun was excluded as the murder weapon,

p.      it omitted the fact that no physical evidence linked Jordan to Kenzie Houk's death,

q.      it omitted the fact that no trace evidence (i.e., no stains or detectible levels of blood existed) was found on Jordan's clothes or shoes, and

r.      it omitted the fact that no gunshot residue was found on Jordan's hands.

194.    The material falsehoods and omissions in the Affidavit of Probable Cause were either made by the PSP Defendants intentionally or with reckless disregard for their truth.

195.    The Affidavit of Probable Cause caused Jordan to become incarcerated.

196.    But for the false and unconstitutional Affidavit of Probable Cause, which was the direct consequence of the established policy, practice and/or custom under Commissioner Pawlowski, no probable cause would have been found against Jordan and he never would have been held for court or adjudicated delinquent of the Criminal Charges.

197.    On July 18, 2018, after being wrongfully incarcerated for the entirety of his youth (almost 10 years in custody), Jordan was exonerated based on insufficient evidence to establish his delinquency for the Criminal Charges.

198.    As a direct and proximate result of the conduct described herein, Jordan suffered significant damage to his reputation, emotional distress, embarrassment, and humiliation, as well as past and future economic losses, among other things.

199.    The conduct described herein demonstrates that the PSP Defendants acted maliciously or wantonly in violating Jordan's constitutional rights.

### COUNT I

**Violation of the Fourth Amendment for Malicious
Prosecution Pursuant to 42 U.S.C. § 1983**

**(As to the PSP Defendants)**

200.    The foregoing paragraphs are incorporated herein by reference.

201.    As a direct result of the conduct described herein, the PSP Defendants violated Jordan's right to be free from malicious prosecution under the Fourth Amendment of the United States Constitution by initiating the Criminal Charges against him without probable cause.

### COUNT II

**Violation of the Fourteenth Amendment for Fabrication of Evidence
Pursuant to 42 U.S.C. § 1983**

**(As to the PSP Defendants)**

202.    The foregoing paragraphs are incorporated herein by reference.

203.    Jordan was convicted (i.e., adjudicated delinquent) of the Criminal Charges because the PSP Defendants fabricated evidence against him and used that fabricated evidence to bring about his prosecution and/or to help secure his conviction.

## COUNT III

### Civil Conspiracy Pursuant to 42 U.S.C. § 1983

### (As to the PSP Defendants)

204.    The foregoing paragraphs are incorporated herein by reference.

205.    The PSP Defendants had an explicit agreement to violate Jordan's constitutional rights under both the Fourth Amendment of the United States Constitution—namely, to be free from prosecution but upon probable cause—and the Fourteenth Amendment of the United State Constitution—namely, to receive due process of law.

## COUNT IV

### Supervisory Liability Pursuant to 42 U.S.C. § 1983

### (As to Commissioner Pawlowski)

206.    The foregoing paragraphs are incorporated herein by reference.

207.    At all relevant times, the PSP Defendants were required to follow established and maintained policies, practices and/or customs on behalf of the PSP.

208.    At all relevant times, Commissioner Pawlowski served as the Commissioner of the PSP—specifically, from 2008 through 2011—and, therefore, served as the chief policymaker for the PSP in all respects during that time.

209.    At all relevant times, in addition to the established policy, practice and/or custom described above, Commissioner Pawlowski established and maintained the following policy, practice and/or custom with respect to preparing affidavits of probable cause:

      a.    to disregard and/or omit plainly exculpatory information and/or evidence,

      b.    to disregard and/or omit material facts that are within the officer's knowledge that would weight on a neutral magistrate judge's determination of probable cause for the criminal offenses charged, and

      c.     to include only facts that support the criminal narrative being set forth by the officer.

210.    At all relevant times, Commissioner Pawlowski established and maintained this policy, practice and/or custom knowing that it would cause material information to be intentionally concealed from the purview of the neutral magistrate judge in approving and/or disapproving the criminal charges based on probable cause.

211.    At all relevant times, this policy, practice and/or custom was established and maintained by Commissioner Pawlowski with deliberate indifference to the consequences that would result from it—namely, that citizens' constitutional rights would be violated because criminal proceedings would be intentionally initiated against them and held over for court without probable cause.

## PRAYER FOR RELIEF

WHEREFORE, Jordan requests that this Court grant the following relief:

      a.     Compensatory damages for:

            i.     emotional and mental harm including fear, humiliation, and mental anguish, as well as future emotional and mental harm for the same,

            ii.     lost wages and income, as well as loss of future wages and income,

            iii.     the value of the legal services expended on defending the Criminal Charges and clearing his name,

            iv.     the value of each day of confinement,

      b.     Punitive damages in an amount to be determined at trial,

      c.     Attorney's fees and costs, and

      d.     All other relief this Court deems just and proper.

Respectfully submitted,

O'BRIEN LAW

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

Timothy P. O'Brien
Pa. ID No. 22104

Margaret S. Coleman
Pa. ID No. 200975

Henry W. Oliver Building
535 Smithfield Street, Suite 1025
Pittsburgh, PA 15222
(412) 232-4400

and

STEVEN M. BARTH & ASSOCIATES

/s/ Steven M. Barth
Steven M. Barth
Pa. ID No. 98395

P.O. Box 23627
Pittsburgh, PA 15222
(412) 779-3806

*Co-counsel for Plaintiff, Jordan Brown*