# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JORDAN BROWN,                                    )
                                                 )
                Plaintiff,                      )
                                                 )
            v.                                     )   Civil Action No. 20-985
                                                 )
JANICE WILSON, JEFFREY MARTIN,                   )
TROY STEINHEISER, MELISSA J.                     )
MCGRAW, *administrator of the estate of*         )
ROBERT A. MCGRAW, III,                           )
                                                 )
              Defendants.                     )

## <u>OPINION</u>

At eleven years old, Plaintiff Jordan Brown ("Brown") was accused of killing his father's eight-months' pregnant partner, Kenzie Houk ("Ms. Houk"). Brown was adjudicated delinquent and spent the rest of his childhood in detention before the Pennsylvania Supreme Court vacated his adjudication for lack of sufficient evidence. After his adjudication was vacated, Brown sued the Pennsylvania State Police Troopers who had investigated his alleged role in Ms. Houk's death—Janice Wilson, Jeffrey Martin, Troy Steinheiser, and Robert McGraw ("Troopers")—in a bid to prove that the Troopers initiated criminal proceedings against him without probable cause and by effectively fabricating a statement by his soon-to-be stepsister in the Affidavit of Probable Cause. That is, Brown sought to prove that the Troopers violated his Fourth and Fourteenth Amendment rights while acting under color of state law pursuant to 42 U.S.C. § 1983. The matter went to trial, and the jury returned a verdict in the Troopers' favor, finding they were neither liable for malicious prosecution nor fabrication of evidence.

Pending before the Court is Brown's post-trial *Motion for Judgment as a Matter of Law, or in the Alternative, Motion for New Trial*. (Docket No. 283). Notwithstanding the jury's verdict finding the Troopers not liable, Brown seeks judgment as a matter of law in his favor for both

claims pursuant to Fed. R. Civ. P. 50(b).  Alternatively, Brown seeks a new trial under Fed. R. Civ. P. 59.  Brown argues that the relief he seeks is justified not only because the evidence presented at trial is insufficient to support the verdict, but also because the Court erred by allowing the jury to resolve legal questions, permitting certain testimony, and not giving adequate instructions.  Brown argues that if there is to be a new trial, it must include: (a) an instruction to the jury as to what ought to have been included in the Affidavit of Probable Cause ("Affidavit") used to obtain the warrant for his arrest; (b) an instruction that components of the warrant application were false; (c) an instruction that child-witness statements are inherently unreliable; and (d) the exclusion of  Jenessa Houk's ("Jenessa") testimony.  The Troopers oppose the motion and seek to uphold the jury's verdict in their favor.  (Docket No. 287).  The parties have also briefed questions of preservation and waiver at the Court's request.  (Docket Nos. 289, 296-99).  For the reasons set forth herein, the motion will be denied.

## I.    **BACKGROUND**

Brown was arrested in the early morning hours of February 21, 2009, on accusation that, the morning prior (February 20th), he killed Ms. Houk by shooting her in the back of the head while she lay in her downstairs bedroom at Brown's father's home.[1]  Ms. Houk's body was discovered by her youngest daughter, four-year-old Adalynn Houk ("Adalynn") after Brown and Ms. Houk's other daughter, seven-year-old Jenessa, left for school.  After finding her mother unresponsive, Adalynn summoned the help of tree-cutters who had come onto the property, who in turn called Pennsylvania law enforcement.  As the investigation into Ms. Houk's death unfolded on February 20th, Brown became the Troopers' primary suspect.  Critical to the Troopers' pursuit

---

[1]    Brown was charged with criminal homicide and criminal homicide of an unborn child under Pennsylvania law, 18 Pa. C.S. §§ 2501(a), 2603(a).

of a warrant for Brown's arrest was a statement Jenessa made shortly after midnight on February

21st, her fourth statement since the shooting. A transcript[2] of this interview follows:

## Transcript of Jenessa Houk Interview
## February 21, 2009—12:16 AM

**Tpr. WILSON:** Okay, Janessa, you know that we're recording this right now, right? And it is--do you have the time?

**Jenny KRANER:** Um...12:16

**Tpr. WILSON:** It is 12:16 on Feb. 21st, and you're here with who? Can you say that for the tape? Tell--tell, who are you here with? Who's this?

**Jenessa HOUK:** Jenny.

**Tpr. Wilson:** And she's?

**HOUK:** Jason.   She's my aunt, and Jason's my uncle.

**Tpr. WILSON:** Okay.  And we were talking earlier and you explained to us what you heard happening this morning, and what you saw happening, and we would like you to tell us those same things again so we can have it recorded on our tape player. Okay? Is that alright?  Alright, let's do the same as we did before, and start at the beginning and you tell us what's the first thing you remember this morning?

**HOUK:** Um, that we got up and I woke him up.

**Tpr. WILSON:** How did you get up?

**HOUK:** Um, my mom yelled up the stairs and I said 'okay.'  Then, then, then I went in and woke Jordan up. Then he went downstairs and I got dressed. Then he got his clothes and he went in the bathroom, and then he got dressed. Then, then, then like, about like five minutes after that, my mom said--I was by the door and he was getting his socks on. My mom said um (pause) he went upstairs and got the guns, then he came downstairs.

**Tpr. WILSON:** Just a second. Your mom said he went upstairs and got the guns, or you're telling us that you saw it?

**HOUK:** No, no, I, I messed up. I messed up. **(WILSON:** Okay; **McGRAW:** Okay) So he went up to--he went--my dad said that he went up--my dad told him to go up and get the guns and bring them down, but he put 'em, brang 'em back up, and then he got his socks on. My mom said, "You better go." And then, and then, he was still in there gettin' his socks on and then I went and got my shoes on, and then I was standing there and I heard a big boom. And I don't—he, then he asked me--and I asked him what it was and he didn't; he didn't tell me. So then we went down to the bus stop.

1

---

2        This transcript was admitted into evidence along with an actual audio recording of the interview.  (*See* Docket No. 280).

**Tpr. WILSON**: Okay, when you heard the big boom, could you see Jason—er—Jordan?

**HOUK:** No

**Tpr. WILSON:** No. He came in the room after that?

**HOUK:** Yeah.

**Tpr. WILSON:** Okay, and just so we have it clear—'cause it got—I'm a little bit confused again. Tell me again about the guns.

**HOUK:** He went up and got 'em, then he brung 'em back down. Then he went up again and put 'em back upstairs, and then he came down, got his socks on; then he came--I was already ready; then, then, before he came to get his shoes on I heard a big boom and I didn't know what it was. And I came--he came in here, and I was like "Jordan, what was that? What was that noise?" And he said, "I don't know what was it--what it was, so then we went--then I and Jordan--we went down to the driveway.

**Tpr. McGRAW:** Jenessa, a little bit ago when, when Jan wasn't in here what did you say that big boom sounded like?

**HOUK:** A gun.

**Tpr. McGRAW:** Okay, and and how do you know what a gun sounds like?

**HOUK:** Because I've heard a gun before.

**Tpr. McGRAW:** How--where have you heard a gun before?

**HOUK:** When my dad and my mom--when my dad and my brother were shootin' outside.

**Tpr. McGRAW:** Okay.

**Tpr. WILSON:** I think we've covered everything. Is there anything else you think we should know or anything else you can remember that happened this morning?

**Jenny KRANER:** Anything you remember?

**HOUK:** No.

**Tpr. WILSON:** Okay, thank you very much. We're going to stop the tape.

2

Based on that statement, which was different from the statements Jenessa provided earlier in the day on February 20th and which did not include mention of a gun or a "big boom," the Troopers drafted an Affidavit to present to the magisterial district judge for an arrest warrant. In the Affidavit, the Troopers included the following from Jenessa's statement:

> A known 7-year-old female, DOB: 3/16/01, who resides in the same residence as the victim and the defendant, was interviewed on 02/21/09, and stated the following relative to Jordan BROWN: "**He went upstairs and got the guns, then he came downstairs … and then, and then he was still in there getting his socks on then I went and got my shoes on and then I was standing there and I heard a big boom … I asked him what it was and he didn't tell me**." Subsequent to being asked if she could see Jordan when she heard the big boom, the 7-year-old female stated "No." Subsequent to being asked if Jordan came in the room after she heard the big boom, the 7-year-old female stated, "Yeah." She was also asked what she had said the big boom sounded like, and she replied, "**a gun.**" When asked how she knew what a gun sounds like, she replied, "Because I've heard a gun before … when my dad and mom, when my dad and my brother were shooting outside." **The 7-year-old female also stated that earlier that morning she observed the defendant carry his two guns downstairs and then carry them back upstairs**.
>
> The 7-year-old female stated that she was awakened on the morning of 2/21/09 [sic] by her mother (the victim) calling to her from downstairs. She stated that a few minutes prior to the "big boom" she heard her mother tell her and the defendant that they needed to leave or they were going to miss the bus. She stated that only herself, the victim, the defendant, and her four-year-old sister (who was sleeping) were present in the residence.

(Docket No. 285, Ex. 16 (emphasis added, and Affidavit reproduced (in full), *infra*)). The Affidavit also included that Brown's father had confirmed that Brown owned a 20-gauge shotgun, and that the autopsy showed Ms. Houk had died of a single shotgun wound to the back of the head. (*Id.*). Troopers Martin and Steinheiser signed the Affidavit and, upon the representations made in it, the judge determined there was probable cause to arrest, and issued a warrant for Brown's arrest for criminal homicide and criminal homicide of an unborn child.



**POLICE CRIMINAL COMPLAINT**

| Docket Number: | Date Filed:<br>02/21/09 | OTN/LiveScan Number: | | Complaint/Incident Number<br>D06-1345557 |
|---|---|---|---|---|
| .fendant Name: | First:<br>Jordan | | Middle:<br>Anthony | Last:<br>BROWN |

## AFFIDAVIT of PROBABLE CAUSE

1. Your affiant has been a member of the Pennsylvania State Police for over seventeen years. On February 20, 2009, a homicide and homicide of an unborn child occurred at 1146 Wampum-New Galilee Rd., New Beaver Borough, New Galilee, PA, 16141, in Lawrence County. The victim in this incident is Kenzie Marie HOUK, Age26, DOB: 04/20/82, along with her unborn male child, with an estimated delivery date of March 8, 2009. Victim HOUK was discovered in the bedroom area of her residence on 02/20/09, by her four-year-old daughter, who then summoned help.

2. An autopsy was performed at Beaver Medical Center by Dr. James SMITH on 02/20/09. Dr. SMITH determined that the victim died of a single shotgun wound to the back of the head. Dr. SMITH further stated that the fetus was viable, and that the cause of death was due to anoxia, which was a result of the death of the mother.

3. A search of the residence was conducted and a Youth Model Harrington and Richardson 20 gauge shotgun, Serial No. HK222953, was located in the upstairs bedroom in which the defendant spent the night.

4. A known 7-year-old female, DOB: 03/16/01, who resides in the same residence as the victim and the defendant, was interviewed on 02/21/09, and stated the following relative to Jordan BROWN: "He went upstairs and got the guns, then he came downstairs...and then, and then he was still in there getting his socks on then I went and got my shoes on and then I was standing there and I heard a big boom...I asked him what it was and he didn't tell me." Subsequent to being asked if she could see Jordan when she heard the big boom, the 7-year-old female stated "No." Subsequent to being asked if Jordan came in the room after she heard the big boom, the 7-year-old female stated, "Yeah." She was also asked what she had said the big boom sounded like, and she replied, "a gun." When asked how she knew what a gun sounds like, she replied, "Because I've heard a gun before...when my dad and mom, when my dad and my brother were shooting outside." The 7-year-old female also stated that earlier that morning she observed the defendant carry his two guns downstairs and then carry them back upstairs.

5. The 7-year-old female stated that she was awakened on the morning of 02/21/09 by her mother (the victim) calling to her from downstairs. She stated that a few minutes prior to the "big boom" she heard her mother tell her and the defendant that they needed to leave or they were going to miss the bus. She stated that only herself, the victim, the defendant, and her four-year-old sister (who was sleeping) were present in the residence.

6. The defendant's father, Christopher BROWN, stated that the 20-gauge shotgun described above belongs to the defendant, and that he had used it to win a turkey shoot on the previous Saturday (02/14/09).

7. The shotgun wadding recovered from the adult victim's body is consistent with the wadding of a 20-gauge shotgun shell. There were no other 20-gauge shotguns located within the residence.
TPR.  TROY  S. STEINHEISER

I, TPR. JEFFREY MARTIN, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

TPR. STEINHEISER  MARTIN

(Signature of Affiant)

Sworn to me and subscribed before me this 21 st day of February 2009

2/21/09  Date _____ , Magisterial District Judge

My commission expires first Monday of January, 2014

SEAL

AOPC 411C - Rev. 12/07

Page 1 of __

The ensuing criminal prosecution of Brown was long and complex; it is described in detail in the Pennsylvania Supreme Court's opinion in *In Interest of J.B.*, 189 A.3d 390 (Pa. 2018). By way of summary, Brown was prosecuted initially as an adult, but sought decertification of his case for transfer to the Juvenile Division of the Court of Common Pleas of Lawrence County, Pennsylvania. *Id.* at 399 n. 7. The juvenile court denied Brown's petition at first because Brown refused to admit guilt. *Id.* (citing *Commonwealth v. Brown*, 26 A.3d 485, 490 (Pa. Super. Ct. 2011)). Brown's refusal to concede guilt was equated with a refusal to accept responsibility, frustrating the rehabilitative goal of juvenile proceedings. *Id.* Brown challenged the refusal of his request for decertification, and the Superior Court determined that "requiring [Brown] to accept responsibility for the conduct he was alleged to have committed in order to obtain decertification would require him to effectively admit his guilt of the particular offenses charged, and, thus, violated his Fifth Amendment right against compulsory self-incrimination." *Id.* (citing *Brown*, 26 A.3d at 490). On remand, Brown's decertification petition was granted.[3]

Brown was adjudicated delinquent, after a bench trial, based on the juvenile court's determination that the evidence was sufficient to establish Brown's responsibility for the offenses with which he was charged. *In Int. of J.B.*, 189 A.3d at 405-06. Brown appealed to the Pennsylvania Superior Court which affirmed by a split panel. *Id.* at 405-07. Brown petitioned the Pennsylvania Supreme Court for review and, in a decision issued July 18, 2018, after Brown had been confined for approximately ten years, the Pennsylvania Supreme Court vacated Brown's adjudication of delinquency because the evidence—even when viewed in the light most favorable to the Commonwealth of Pennsylvania—was, "at best, in equipoise" as to two possibilities: (1) that Brown killed Ms. Houk, and (2) that another person or persons entered the Brown-Houk home

---

[3]    *Commonwealth v. Brown*, No. CR2009320, 2011 WL 10655841, at *5 (Pa. Com. Pl. 2011).

while Ms. Houk was sleeping and shot her to death after Brown and Jenessa had left for school. *Id.* at 421.  Because of the Supreme Court's ruling, Brown was discharged.[4]

After his adjudication was vacated and he was discharged, Brown filed this civil suit against the Troopers[5] in a four-count complaint: (**Count I**) Fourth Amendment, Malicious Prosecution; (**Count II**) Fourteenth Amendment, Fabrication of Evidence; (**Count III**) Civil Conspiracy; and (**Count IV**) Supervisory Liability.  (Docket No. 1).  The Troopers answered Brown's complaint (Docket No. 12) and, after this case was reassigned to the undersigned on October 19, 2020, the Court entered a Case Management Order establishing initial discovery deadlines and setting a time for a post-discovery status conference, all of which were set to occur by May 2021.  (Docket No. 21).  At the parties' requests, the discovery deadlines set in this Court's initial Case Management Order were extended; as of September 2021, the parties conveyed to the Court that they hoped to complete fact discovery by November of that year.  (Docket No. 29).  The case was referred to mediation but did not resolve.  (Docket Nos. 30, 38).

Not much later (January 2022), the parties stipulated to expert discovery deadlines, agreeing that all depositions were to be completed no later than September 15, 2022.  (Docket No. 35).  The Court later granted Brown's request to extend the time for expert depositions and other expert discovery to November 30, 2022.  (Docket Nos. 39, 40).  The Troopers subsequently moved for an extension of time to complete discovery (without objection), and the Court accordingly entered an Order indicating that the Troopers' motion would be granted, directing that discovery

---

[4]     The Pennsylvania Supreme Court indicated in its opinion and order that Brown's adjudication of delinquency was vacated and he was discharged; however, the Supreme Court further noted that, at the time of its decision, Brown had been released from custodial detention "after successfully completing all of the goals set forth in his rehabilitation plan, and with the acquiescence of the Attorney General."  189 A.3d at 405 n. 15.

[5]     Frank Pawlowski was originally among the Defendant Troopers, but was terminated as a defendant before trial.  (Docket No. 229).

matters (culminating in expert depositions) be completed by January 31, 2023, and setting a status conference for February 7, 2023.  (Docket No. 46).  After the February 2023 status conference, the Court imposed a deadline for any motions for summary judgment and briefing—March 24, 2023, and May 1, 2023, respectively.  (Docket No. 48).

In March 2023, instead of summary judgment motions, the parties filed a Joint Stipulation indicating that all discovery (fact and expert) was closed and that, since the February 2023 status conference, they had conferred and compromised to release certain claims.  (Docket No. 49).  As part of that compromise, the parties stipulated to a trial on Counts I (malicious prosecution) and II (fabrication of evidence).  (*Id.* at 2 ("As a compromise of the claims and defenses asserted in this case, and without admitting to the existence or non-existence of liability on any claims or defenses in this case, the Parties … stipulate to … dismissal of Count III (Civil Conspiracy) and Count IV (Supervisory Liability)," also indicating that the Parties "stipulate to a trial on **Count I (Malicious Prosecution)** and **Count II (Fabrication of Evidence)**") (emphasis added)).  The Court approved the stipulation and set a conference date to schedule a trial for the remaining two Counts.  (Docket Nos. 50-52).

At the ensuing conference on May 8, 2023, the Court scheduled a trial for February 5, 2024, and issued a Pretrial Order.  (Docket No. 56).  Because of the demands of the Court's criminal docket, Brown and the Troopers' trial could not go forward as planned in February 2024; however, when the Court postponed the trial it left all pretrial deadlines in place and held Oral Argument on many of the pretrial filings on April 23, 2024.  (Docket Nos. 68, 114).  At Oral Argument, the Court addressed pending motions and proposed jury instructions, specifically: Brown's *Motion for Proposed Jury Instructions that there was No Probable Cause to Arrest Plaintiff, and that Defendants Used Fabricated Evidence to Arrest Plaintiff* (Docket No. 98); the

Troopers' *Motion In Limine (First) to Exclude Evidence and Testimony of Expert Witnesses* (Docket No. 86); and the Troopers' *Motion In Limine (Second) to Exclude Certain Evidence of Damages and/or to Bifurcate Trial Issues* (Docket No. 88).

Particularly relevant to Brown's now-pending motion for judgment or a new trial, Brown's counsel argued in support of his motion at Docket No. 98, that there were no material facts in dispute for the element of probable cause for malicious prosecution, and that there were no material factual disputes over whether there had been intentional fabrication of evidence. (Docket Nos. 98; 117 at 5-7). In other words, Brown effectively was seeking an untimely partial summary judgment framed as a proposed jury instruction, despite previously stipulating to a trial on these claims, rather than filing any motion for summary judgment. Brown argued that the Court should instruct the jury that the Troopers had no probable cause to arrest him and also fabricated evidence leading to his arrest, as determinations made by the Court as matters of law. Along with those issues, the parties presented additional arguments, and the Court addressed a number of other important issues that would significantly affect the trial, including the following: whether evidence of actual guilt was relevant after *Thompson v. Clark*, 596 U.S. 36, 49 (2022), and its holding that malicious prosecution claims arising under the Fourth Amendment and Section 1983 do not require a showing that a criminal prosecution ended with an affirmative indication of innocence; whether evidence of the Troopers' activities and investigation after Brown's arrest would be relevant to their liability for either malicious prosecution or fabrication of evidence; whether evidence of Brown's confinement after his adjudication could be presented to the jury; whether malice is inferable from a finding of no probable cause to arrest for purposes of malicious prosecution; the time at which malice is assessed for purposes of malicious prosecution; bifurcation of trial; motions on experts and whether the Troopers would seek a hearing(s) under *Daubert v. Merrell*

*Dow Pharms., Inc.*, 509 U.S. 579 (1993); whether Brown intended to present evidence or a theory of the case that the Troopers intentionally manipulated Jenessa into incriminating Brown; and what (if any) photographs from Brown's childhood would be relevant to the issues to be tried and not unduly prejudicial.

The Court ruled on some of the motions from the bench and gave inclinations as to others that it ultimately took under advisement. (Docket No. 117 at 71-72).  To begin with, the Court noted that Brown's proposal for jury instructions seeking certain findings to be made and presented to the jury read more like a motion for summary judgment, which the parties had opted not to file as part of their earlier stipulation.  (*Id.* at 72).  In making that observation, the Court was emphatic in pointing out that it was not calling the motion improper but, at least at that time, the Court explained that there appeared to be material factual disputes remaining, "particularly around the existence of probable cause" and "malice" such that the Court determined it was premature to decide that it would instruct the jury that those matters were "already determined."  (*Id.* at 73). The Court explained that it would deny Brown's request for such instructions without prejudice and that, while the Court was not inclined to give such instructions, Brown was permitted to revisit the matter.  (*Id.*).  That ruling was consistent with the Court's indication at the beginning of the April 23rd Oral Argument that the Court did not intend for this oral argument to replace a charge conference at the time of trial during which the Court would make final rulings on jury instructions. (*Id.* at 3-4).

In the months that followed that Oral Argument until the case was tried in December 2024, many complexities and other developments arose.  First, the parties' responded to the Court's call for supplemental briefing on the possibility of bifurcation (Docket No. 116), but instead of briefing the issue the parties stipulated to bifurcation into Phase I—Liability, and Phase II—Damages.

(Docket No. 120). Shortly after receiving the parties' stipulation to bifurcation, the Court ordered the parties to confer and attempt to agree on a unified set of supplemental/amended proposed jury instructions and verdict slips/special interrogatories, and further ordered the parties to file briefs on any instructions on which they could not reach agreement. (Docket No. 126). Proposed instructions and briefs were to be filed by September 9, 2024, with responses due September 16, 2024. (*Id.*). In the interim, the Court issued an Amended Pretrial Order scheduling trial for December 3, 2024. (Docket No. 128). Pursuant thereto, the parties were to file: Amended Pretrial Statements by September 30, 2024, and October 15, 2024, respectively; motions in limine by October 23, 2024, with responses due October 30th; and proposed voir dire and joint stipulations by October 30, 2024. (*Id.*).

As the trial date approached, counsel for the Troopers from the Pennsylvania Office of Attorney General moved to withdraw, and attorneys from the Pennsylvania State Police ("PSP") moved to substitute. (Docket Nos. 129-31, filed September 3 and 5, 2024). To address the proposed change of counsel so close to trial, the Court scheduled a telephonic status conference for September 10, 2024.[6] (Docket No. 133). Shortly before the September 10th conference, the parties filed Joint Proposed Jury Instructions on Liability (Phase I) in which they *indicated they had reached agreement on all substantive instructions*. (Docket No. 134).[7] At the September 10th conference, the Court addressed the instructions and indicated its willingness to let the Attorney General's office withdraw and allow substitution of PSP counsel, as long as new counsel could

---

[6]    An official transcript of the Status Conference held on September 10, 2024, has not been filed on the docket. Therefore, the Court's citations to that Status conference are based on a draft copy of the transcript.

[7]    To the extent that document reflected apparent disagreement, the parties clarified at the September 10th conference that they were in complete agreement on substantive liability instructions and that indications to the contrary were due to typographical errors. (9/10/24 Transcript at 10 (Counsel for Brown: "With respect to the liability instructions, those were joint. There is no dispute.")).

meet all existing pre-trial deadlines.  PSP counsel confirmed they would meet all existing deadlines; therefore the Court permitted their substitution as counsel, but immediately thereafter PSP Counsel stated that (a mere twelve weeks before trial) they intended to seek to reopen expert discovery for "some expert depositions," "future motions in limine," or "*Daubert* hearings." (9/10/24 Transcript at 3).  PSP counsel also stated that they intended to file a motion for judgment on the pleadings to assert qualified immunity for the Troopers, an important threshold issue that was never before raised in a motion to dismiss or a motion for summary judgment.  (*Id.* at 5).  In response, the Court pointed out that prior counsel had made it clear that the Troopers had no intention of seeking *Daubert* hearings.  Not only that, but the case had been pending over four years with no motion for judgment on the pleadings or other dispositive pre-trial motions. Nonetheless, the Court gave PSP counsel for the Troopers several days to file briefs seeking leave to make these requests, with an opportunity for Brown to respond.  (*Id.* at 8).  After this conference, the parties filed Amended Proposed Jury Instructions On Damages (Phase 2) with objections (Docket. No. 145), but later withdrew those objections (Docket No. 153).  Upon that withdrawal, no disagreement or objections on substantive instructions remained, and the parties then were in total agreement on instructions as they had opted not to pursue the opportunity the Court had afforded them for briefing and seeking to dispute instructions.

The Court thereafter denied the Troopers' motion to reopen expert discovery (Docket No. 156) and denied the Troopers' Motion for Judgment on the Pleadings raising qualified immunity (Docket No. 157).  The parties filed motions in limine in October 2024, which included motions: to preclude evidence of Trooper Wilson's involvement in another lawsuit; to exclude expert witnesses proffered by Brown; to preclude admission of Brown's mugshot on the night of his arrest; to preclude evidence or argument about information that was unknown to the Troopers

when they arrested Brown; to exclude Jenessa as a witness; to preclude evidence or argument about Brown's ultimate guilt or innocence or any opinion testimony on the same; to exclude arguments about Brown's behavioral and mental health that was not known to the Troopers at the time of arrest from Phase I; to exclude Jennifer Kraner; to preclude admission of prior judicial decisions other than the favorable termination decision by the Pennsylvania Supreme Court; to exclude certain "may call" witnesses; and various other motions. (Docket Nos. 169, 171, 173, 175, 177, 179, 181, 183, 185, 187, 189, 193, 195). At that time, Brown also filed a *Motion to Include Jury Instruction on Affidavits of Probable Cause*, which the parties admittedly had overlooked in their submission of jointly proposed instructions. (Docket No. 191). In the brief accompanying that motion, Brown advocated for an instruction that would educate the jury on the role of affidavits of probable cause in arrests. Brown argued that the proposed instruction should include, *inter alia*, that: "Law enforcement officers are required to provide all relevant information, which ensures that a police officer does not make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." (Docket No. 192 at 3).

The Court held Oral Argument on pending motions on November 7, 2024. (Docket No. 225). Coming out of that extensive argument, the Court ordered, among other things, that: Brown's *Motion to Preclude Evidence or Argument about Information that was Unknown to the Troopers when they Arrested Brown* (Docket No. 177) would be granted for Phase I of trial in light of *Thompson v. Clark*; the motion on opinion testimony on Brown's actual guilt or innocence (Docket No. 181) would be denied as moot in light of the parties' stipulation to bifurcation; and the motion concerning exclusion of evidence related to Brown's behavioral and mental health (Docket No. 183) would be denied as moot in light of the parties' resolution of that issue. (Docket

No. 226).[8]  The Court thereafter also held a *Daubert* hearing regarding Brown's proposed expert witnesses.  (Docket Nos. 260, 262).

The trial then began as scheduled on December 3, 2024.  (Docket No. 264).  At the close of Brown's case-in-chief, the parties each moved for judgment as a matter of law under Fed. R. Civ. P. 50(a) and the Court denied those motions.[9]  (Docket Nos. 271-72, 274).  The Troopers' concluded the presentation of their case-in-chief on December 11, 2024, and a Charge Conference was held to address final jury instructions the same day.  (Docket No. 275).  Counsel for the parties had the opportunity to review the Court's draft final jury instructions before their closing arguments.  (*Id.* and Docket No. 276).  There were no substantive objections lodged at that time that are relevant to the now-pending motion.  Also, none of the parties renewed their motions for judgment as a matter of law at the conclusion of Phase I before the matter was submitted to the jury.  After closing arguments, the jury began deliberations and, the following day (December 12, 2024), the jury reached a verdict for the Troopers.  (Docket Nos. 277, 281).  As indicated above, Brown seeks to challenge that verdict and obtain either a verdict in his favor under Fed. R. Civ. P. 50, or a new trial under Fed. R. Civ. P. 59.

---

[8]    Also in November 2024, as trial quickly approached, questions arose concerning Trooper McGraw's status as a defendant in light of his death, and the parties worked quickly with the Court to resolve this issue and have McGraw's estate substituted as a party.  (Docket Nos. 242, 255, 256, 257, 258, 259).

[9]    Brown having concluded his case-in-chief, the Troopers moved for judgment in their favor, arguing that they ought to prevail on their Rule 50 motion because Brown had failed to marshal sufficient evidence to support a verdict in his favor on his malicious prosecution and fabrication of evidence claims, and the Troopers further argued for qualified immunity.  (Docket No. 274 at 2)  In his own Rule 50 motion, Brown argued that, in light of his presentation of his case, the jury could reach no verdict other than one finding all of the Troopers liable for malicious prosecution and fabrication of evidence, contending that nothing the Troopers might present in their own cases-in-chief could affect that inevitable outcome.  (*Id.*).

## II.    LEGAL STANDARDS

### A.    Rule 50 – Judgment as a Matter of Law in a Jury Trial

"Federal Rule of Civil Procedure 50 … governs motions for judgment as a matter of law in jury trials."  *Weisgram v. Marley Co.*, 528 U.S. 440, 447 (2000).  A litigant may move for judgment as a matter of law under Rule 50(b), to renew any arguments such litigant made in a Rule 50(a) motion,[10] within twenty-eight days from the entry of judgment.  Under Rule 50, the Court is permitted to gauge the sufficiency of the evidence underlying the verdict; that is, "such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *Murphy v. City of Phila. Dep't of Recreation*, No. 07-CV-4104, 2011 WL 3652480, at *2 (E.D. Pa. Aug. 19, 2011) ("[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; it may not make credibility determinations or weigh the evidence, as those are jury functions—not those of a judge." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000))).  The purpose of Rule 50 is to give trial courts

---

10    Under Rule 50(a) of the Federal Rules of Civil Procedure:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>      (A) resolve the issue against the party; and
>      (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
> …
> A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a)(1)-(2).

the ability "to remove cases or issues from the jury's consideration 'when the facts are sufficiently clear that the law requires a particular result.'" *Weisgram*, 528 U.S. at 448 (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2521, p. 240 (2d ed. 1995)).  "Judgment as a matter of law 'is an extraordinary remedy when urged by an unsuccessful plaintiff who bore the burden of proof at [trial].'"  *Robinson v. Fair Acres Geriatric Ctr.*, No. CV 15-06749, 2020 WL 1313721, at *2 (E.D. Pa. Mar. 20, 2020), *aff'd*, 842 F. App'x 779 (3d Cir. 2021) (quoting *Link v. Mercedes-Benz of N. Am.*, Inc., 788 F.2d 918, 921 (3d Cir. 1986)).

B.    Rule 59 – New Trial

Rule 59 gives the courts discretion to order a new trial "on all or some of the issues—and to any party," in the case of a jury trial, "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Such reasons include: "(1) improper admission or exclusion of evidence; (2) improper instructions to the jury; (3) misconduct of counsel; (4) newly discovered evidence; or (5) a finding that the jury's verdict is against the weight of the evidence."  *Davis v. Gen. Acc. Ins. Co. of Am.*, 153 F. Supp. 2d 598, 600 (E.D. Pa. 2001); *Washington v. Jones*, No. CV 18-342, 2022 WL 4279874, at *2 (W.D. Pa. Sept. 15, 2022), *aff'd sub nom. Washington v. Gilmore*, No. 22-2408, 2023 WL 2041612 (3d Cir. Feb. 16, 2023) (citing *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993), and *Brown v. Nutrition Mgmt. Servs. Co.*, 370 F. App'x 267, 268-70 (3d Cir. 2010)).  Motions for judgment as a matter of law are often accompanied by motions for a new trial; however, even a party that "fails to move for judgment as a matter of law under Rule 50 can still petition the district court under Rule 59 to 'critically evaluate the evidence and exercise its discretion in favor of a new trial because the probative evidence in their favor as contrasted with that opposed is overwhelming.'" *T. Levy*

17

*Assocs., Inc. v. Kaplan*, 755 F. App'x 116, 120 (3d Cir. 2018) (quoting *Greenleaf v. Garlock, Inc*., 174 F.3d 352, 365 (3d Cir. 1999)).[11]

When a request for a new trial under Rule 59 is based on an argument that the jury's verdict was against the weight of the evidence, it is only appropriate for the court to grant the relief requested if "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *T. Levy Assocs*., 755 F. App'x at 121 (quoting *Greenleaf*, 174 F.3d at 366). When a request for a new trial under Rule 59 is based on "an alleged error concerning the court's evidentiary rulings or jury instruction," the court "must first determine whether an error was made during the course of the trial, and then determine 'whether that error was so prejudicial that refusal to grant a new trial would be "inconsistent with substantial justice."'" *Bogaski v. Cnty. of Allegheny*, No. CV 15-487, 2018 WL 1471977, at *1 (W.D. Pa. Mar. 26, 2018) (quoting *Bhaya v. Westinghouse Elec. Corp*., 709 F. Supp. 600, 601 (E.D. Pa. 1989)). The movant bears the burden of proof for Rule 59 motions. *Whelan v. Teledyne Metalworking Prods.*, No. CA 01-1316, 2006 WL 39156, at *7 (W.D. Pa. Jan. 6, 2006), *aff'd*, 226 F. App'x 141 (3d Cir. 2007). The decision to grant a new trial after a jury verdict under Rule 59 is discretionary, and new trials are disfavored. *State Farm Mut. Auto. Ins. Co. v. Lincow*, 715 F. Supp. 2d 617, 626 (E.D. Pa. 2010), *aff'd*, 444 F. App'x 617 (3d Cir. 2011); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 386 (3d Cir. 2016) (explaining that courts should grant a new trial "only when 'the great weight of the evidence cuts against the verdict and ... a

---

[11]    Some courts have cautioned that "motions for a new trial should not be used as a loophole for presenting sufficiency arguments that were not properly preserved by a pre-verdict motion for JMOL." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 509 (6th Cir. 2016). Also, the Third Circuit has held that "a new trial may be granted even when judgment as a matter of law is inappropriate." *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995).

miscarriage of justice would result if the verdict were to stand'" (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006))).

## III.    **DISCUSSION**

In his motion for judgment as a matter of law or a new trial, Brown makes arguments that can be categorized loosely into four themes.  First, Brown argues that the Court should find, as a matter of law, that the Troopers—particularly Trooper Wilson—omitted material evidence from the Affidavit.  Brown argues that the omissions in the Affidavit should have been declared material as a matter of law by the Court, and that the Court should reconstruct the Affidavit and decide as a matter of law whether or not there was probable cause to arrest Brown because that "process is generally a *question of law* for the court."  (Docket No. 284 at 20, 23 (emphasis added)).  Second, Brown argues that this Court should determine that uncorroborated statements of young children are inherently unreliable and cannot support a finding of probable cause.  Third, Brown argues that the Court should decide as a matter of law that the Troopers fabricated Jenessa's midnight statement used in the Affidavit, which was critical to obtaining a warrant for Brown's arrest. Fourth and finally, Brown argues that allowing Jenessa to testify at trial was prejudicial error because Jenessa testified to matters that were beyond the Court's rulings on motions in limine. Before the Court addresses these arguments, however, the Court must first evaluate whether Brown waived his opportunity to move for judgment under Rule 50(b) at this juncture.

### A.    Wavier of Rule 50 Motion

Rule 50 requires that a movant "timely move for judgment as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion." *Lightning Lube*, 4 F.3d at 1172-73.  The Rule itself is clear insofar as a party against whom judgment is sought must be heard fully on an issue at trial before a court may grant such motion

against the interests of that party. *See Bradshaw v. Capacity of Texas Inc*., No. CV 99-6366, 2016 WL 8716595, at *4 (E.D. Pa. Aug. 26, 2016) ("Therefore, under Rule 50(b), a court cannot enter a judgment as a matter of law unless the party seeking the judgment made a Rule 50(a) motion at the close of *all of the evidence*." (quoting *Larami Corp. v. Amron*, No. 91-6145, 1995 WL 128022, at *1 (E.D. Pa. Mar. 23, 1995))). That is, "the proper time frame for asserting a Rule 50(a) motion is after the opposing side rests its case at trial," *i.e.*, completes its presentation on the issue addressed in the Rule 50(a) motion, "and before the case is submitted to the jury for deliberations." *Jordan v. Murin*, No. 1:18-CV-228-SPB, 2021 WL 12313013, at *2 (W.D. Pa. Oct. 25, 2021) (denying plaintiff's motion for leave to file a motion for summary judgment pursuant to Rule 56 or a motion for judgment as a matter of law under Rule 50(a)). Other than specifying that the nonmovant must be fully heard, Rule 50(a) tells litigants that they may file a motion for judgment as a matter of law "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2).

A motion made under Rule 50(b)—like the one here—is the renewal of a motion at trial under Rule 50(a). Without a motion "in accordance with … Rule … 50(a), judicial reexamination of the evidence abridges a party's right to a trial by jury." *Lightning Lube*, 4 F.3d at 1173 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992)); *Fineman*, 980 F.2d at 183 ("Requiring compliance with Rule 50(a)'s commandment that 'a motion for a directed verdict shall state the specific grounds therefor' additionally ensures that the party bearing the burden of proof will have an opportunity to buttress its case before it goes to the jury and the moving party will not gain an unfair advantage through surprise."); *see Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3d Cir. 1991) (explaining that it's particularly important that any sufficiency arguments—as opposed to legal error arguments premised on timely objections—be raised at the

close of evidence, before submission to a jury, otherwise a movant "wholly waives the right to mount any post-trial attack on the sufficiency of the evidence").

In this case, Brown, as the plaintiff with the burden of proof, affirmatively moved for judgment as a matter of law under Rule 50(a) at the close of *his* case-in-chief, but before the Troopers had presented their case.[12]  (Docket No. 271).  The Troopers also moved for judgment as a matter of law based upon qualified immunity and for failure to establish claims.  (Docket No. 272).  Brown and the Troopers argued those motions orally, in lieu of written briefs.  (Docket Nos. 270-72).  The Court denied each of the parties' motions and explained the bases of its decisions on the record.  (Docket No. 274).  Regarding Plaintiff's motion, the Court explained as follows:

> And I note that under Rule 50(a)(1), such a motion is presented when a party has been fully heard.  Here in this instance, ***the defendants have not put on their case in chief yet.  So, in the Court's view, this Rule 50(a) motion with respect to plaintiff, on behalf of plaintiff, is premature***.  You know, ***at this juncture the defendants have not been fully heard on the issue of liability*** ….  So for those combination of reasons but mostly because defendants haven't been fully heard, I'm going to deny the plaintiff's Rule 50 motion, as well.

(Docket No. 293 at 19 (emphasis added)).  Despite the Court's explicit ruling that Brown's Rule 50(a) motion was denied because it was premature, Brown never filed or re-asserted his motion under Rule 50(a) at the close of the *Troopers'* case-in-chief, *i.e.*, after the Troopers had been fully heard regarding liability for malicious prosecution and fabrication of evidence.  For that reason, Brown's Rule 50(b) motion is procedurally deficient and abridges the Troopers' right to a trial by jury.  *C.J. Hughes Constr. Co. Inc. v. EQM Gathering OPCO, LLC*, No. 2:18-CV-168, 2022 WL 2318172, at *3 (W.D. Pa. June 28, 2022), *aff'd*, No. 22-3391, 2024 WL 1652341 (3d Cir. Apr. 17, 2024) ("Absent a motion in accordance with Federal Rule of Civil Procedure 50(a), judicial

---

[12]     Brown called the Troopers as witnesses in his case-in-chief pursuant to Fed. R. Evid. 611(c)(2), and Trooper Wilson testified again in the Troopers' case-in-chief.

reexamination of the evidence abridges a party's right to a trial by jury." (quoting *Lightning Lube*, 4 F.3d at 1173)).

In his response to this Court's order for additional briefing, Brown protests any suggestion that he waived his opportunity to move for judgment post-trial under Rule 50(b). Brown argues that a plain reading of Rule 50 shows that a motion for judgment as a matter of law may be made at any time before the matter is submitted to the jury, and that the Advisory Committee Notes to the Rule's 2006 Amendment supports his conclusion because, therein, the Advisory Committee explained that the Rule no longer requires that a motion be made at the close of all the evidence. (Docket No. 297 at 5-6). Thus, Brown argues, when the "plain letter of Rule 50" and the "Advisory Committee Notes" are read together, they show that Plaintiff's Rule 50(b) motion followed a Rule 50(a) motion "that was made after the party against whom such was made had been 'fully heard.'" (*Id.* (quoting Docket No. 289)).

The Court does not agree that the plain text of Rule 50 supports Brown's argument. It is clear enough that the plain text of Rule 50 requires, as a predicate to any motion made under subpart (a), that the non-moving party must be "fully heard" on the issue relevant to the movant's motion:

> **(a) Judgment as a Matter of Law.**
> **(1)** ***In General.*** *If a party has been fully heard on an issue* during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> **(A)** resolve *the issue* against the party; and
> **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on *that issue*.
> **(2)** ***Motion.*** A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50 (emphasis added).  Indeed, Rule 50(a) no longer requires a motion to be made under this provision at the close of all the evidence, as it did prior to the 2006 Amendments,[13] so a defendant who moves for judgment under Rule 50(a) after the plaintiff has been fully heard is not required to make its motion at the close of all the evidence.  That said, the amendment eliminating the close-of-the-evidence requirement did not nullify the requirement that a non-moving party be fully heard on an issue(s) before the Court considers a motion under Rule 50(a) contrary to the non-movant's interests.  And here it was Brown, not the Troopers, who made his Rule 50(a) motion before the Troopers were fully heard.  For that reason, the Court rejects Brown's argument that he has satisfied the requirement for his renewed motion pursuant to Rule 50(b) because he had not properly moved for judgment under Rule 50(a).[14]  For that reason, the Court will deny Brown's renewed motion under Rule 50(b).

## B.    The Probable Cause Determination for Malicious Prosecution

Even though the Court has determined that Brown waived his opportunity to seek relief from the adverse verdict under Rule 50, the Court will review all of Brown's substantive arguments pursuant to the standard set forth under Rule 59.  If a Rule 59 motion is based on an alleged error,

---

[13]    *See, e.g.*, *Kruczek v. Borough of Lansford*, No. CIV.A. 3:04-CV-1179, 2006 WL 1410620, at *1 (M.D. Pa. May 21, 2006) ("In the present case, Defendants made a motion to dismiss Plaintiff's case pursuant to Rule 50 at the close of Plaintiff's evidence.  Defendants, however, did not make a motion pursuant to Rule 50 at the close of all evidence. Accordingly, Defendants have waived their claim for a renewed motion for judgment as a matter of law."); *see also* 2 Federal Rules of Civil Procedure, Rules and Commentary Rule 50, § 50:19 ("In other words, a defendant who makes a motion after the plaintiff rests no longer needs to make another motion at the close of all evidence in order to have something to renew"), and  § 50:15 ("[t]he earliest time a Rule 50(a) motion can be filed is after the party against whom the issue would be resolved has been fully heard.").

[14]    If the Court had suggested to Brown that a renewed motion at the close of the Troopers' case, *i.e.*, after their opportunity to be fully heard, would have been unnecessary or futile, or if the evidence presented by the Troopers had been inconsequential, it would perhaps be permissible for Brown to pursue relief under Rule 50(b) now.  But that was precisely the opposite of what happened here where, rather than indicate to Brown that renewal of his Rule 50(a) motion was not necessary, this Court pointed out to Brown that the Troopers had not been fully heard, so his motion under Rule 50(a) was premature.  (Docket No. 293 at 19).  *See Larami*, 1995 WL 128022, at *3 ("Second, rather than indicate to the defendants that renewal of their Rule 50(a) motion was not necessary, this Court specifically suggested to defendants that they had to renew their motion.").

then the first step of a Rule 59 inquiry is to determine whether there really was an error at trial and whether it was "so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Marcum v. Columbia Gas Transmission, LLC*, 658 F. Supp. 3d 252, 265 (E.D. Pa. 2023) (quoting *Price v. Trans Union, L.L.C.*, 839 F. Supp. 2d 785, 792 (E.D. Pa. 2012)).  For arguments based on evidentiary sufficiency—rather than error—the Court may exercise its discretion under Rule 59 to give a party a new trial if there was "insufficient evidence to support the verdict or where the verdict was against the weight of the evidence" even in the absence of a Rule 50 motion. *Greenleaf*, 174 F.3d at 365.  If a Rule 59 motion is premised on the idea that the jury's verdict cut against the weight of the evidence, then the Court will grant such motion if, comparing evidence to the verdict, it shocks the conscience.  *T. Levy Assocs.*, 755 F. App'x at 121.

    i. *Whether the Court Erred in Instructing the Jury on Malicious Prosecution*

  Brown argues that materiality—a component of the probable cause determination for malicious prosecution—should be decided by the Court "before instructing the jury" and that "reconstruction and [a] legal decision" regarding the objective reasonableness of Brown's arrest "should have been made prior to instructing the jury in this case."  (Docket No. 288 (*Brown Reply Brief in Support of Motion for Judgment as a Matter of Law or New Trial*) at 2-3, 5 ("This injustice was compounded by allowing the jury (and not the judge) to decide the legal question of materiality and affidavit reconstruction when deciding the issue of probable cause.").  *But see* Docket No. 297 (*Brown Response to Order for Additional Briefing*) at 5 ("[T]his Court properly allowed the jury to deliberate and reach its verdict" and, because the verdict was unfavorable, the Court "now has the privilege to right a manifest injustice in the verdict.").  Brown argues that the Court can correct its error by reconstructing the affidavit of probable cause and making a materiality determination now, in deciding the motion for judgment or a new trial, *i.e.*, that the Court "should reconstruct the

affidavit of probable cause and decide as a matter of law whether or not there is probable cause."
(Docket No. 284 at 23, 29 ("No reasonable jury could find probable cause to arrest Jordan Brown
as a matter of law based on a reconstructed affidavit of probable cause.")).

In this regard, the error argued by Brown is essentially that though the Court instructed the
jury on standards relevant to probable cause, there were important *legal questions* that should have
been resolved *by the Court*, namely: (1) whether the Troopers knowingly and deliberately, or with
reckless disregard, made false statements or omissions that created a falsehood in the affidavit of
probable cause; and (2) whether the false statements or omissions were material to the probable
cause determination.  The Court first addresses preservation, before addressing the substance of
Brown's contention.

As discussed, *supra*, Section I, Brown filed a motion in December 2023 titled *Motion for
Proposed Jury Instructions that there was No Probable Cause to Arrest Plaintiff, and that
Defendants used Fabricated Evidence to Arrest Plaintiff* (Docket No. 98).  Along with that motion,
Plaintiff filed a Proposed Order that included proposed final jury instructions for malicious
prosecution and fabrication of evidence.  (Docket No. 98-1).  For malicious prosecution, Plaintiff's
proposed instruction was that:

> Mr. Brown has proved an absence of probable cause in this case.
> That is to say that it has been decided as a matter of law that
> Defendants initiated criminal proceedings against Mr. Brown
> without probable cause.  Therefore, with respect to the claim for
> malicious prosecution, you are only to consider whether Jordan
> Brown has proved the element of malice.

(*Id.* at 2).

The Court held Oral Argument on the motion—and numerous other issues—on April 23,
2024.  (Docket Nos. 115, 117).  At Oral Argument, the Court explained that the record before it at
that time was not "as adequate as it ought to be" for the Court to, essentially, "make a ruling on

summary judgment." (Docket No. 117 at 72 (explaining that the record before the Court was "one particular reason why … granting [the] motion at [that] time" would not be appropriate)). The Court also explained that, at that time, there seemed to be material factual disputes pertinent to the existence of probable cause and to the question of malice, so the Court said that it would "***deny [the] motion***" but "***without prejudice***," to allow for renewal of such a motion if the factual record changed as trial approached. (*Id.* at 73 (emphasis added)). The Court reflected its decision in an accompanying Order, again making clear that the denial of Plaintiff's motion at Docket No. 98 was a non-final denial without prejudice. (Docket No. 116). After that, Brown and the Troopers filed joint *Proposed Jury Instructions on Liability (Phase I)* for malicious prosecution and fabrication of evidence. (Docket No. 134).[15] The jointly proposed jury instruction submitted on malicious prosecution included the following:

> As to the third element [that the proceeding was initiated without probable cause] Plaintiff must prove that the Defendant lacked probable cause to initiate the proceeding against him. To determine whether probable cause existed, you should consider whether the facts and circumstances available to the Defendant would warrant a prudent officer in believing that Plaintiff had committed or was committing a crime. In making this determination, you are to consider information that was available to the defendants individually at the time they arrested Jordan Brown on February 21, 2009. Probable cause is an objective inquiry of that of a reasonably prudent person and applies to the totality of the circumstances. Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves

---

[15] As the Court noted, *supra*, Section I, in the docketed version of the parties' jointly proposed jury instructions, there is a notation at the end of the malicious prosecution instruction indicating that the proposed instruction was *not* agreed to by the parties; however, at a status conference held the day after the parties filed those instructions, they clarified that they in fact *did agree* on all liability instructions, that there was "no dispute" as to those instructions on which they had "spent literal hours conferencing and sending back case law and going through the entire process." (9/10/24 Transcript at 10). To make sure the parties did, in fact, agree on the malicious prosecution instruction, the Court addressed the conflicting filing, saying: "I don't understand then. Let me stop you there … because I'm looking at Instruction 4.5. 'The proposed instruction is not agreed upon by the parties.' Instruction 4.13, malicious prosecution, 'proposed instruction is not agreed upon by the parties.' Am I missing something." (*Id.*). Brown's counsel responded: "It is a typo by me, Your Honor…. The word 'not' was in this document. From working through the prior two sets of instructions we had created and formatted, I had done my best to read this [a] million times and catch all my typos, and I missed two 'nots.' ***It should just be 'agree.'***" (*Id.* (emphasis added)).

> to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. Probable cause requires more than mere suspicion; however, it does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt. The standard of probable cause represents a balance between the individual's right to liberty and the government's duty to control crime. Probable cause does not require officers to correctly resolve credibility determinations or conflicting evidence, but it does require reasonably trustworthy information or circumstances to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested.

(Docket No. 134 at 8-10).

Consistent with the parties' jointly proposed instructions on malicious prosecution, the Court presented draft final jury instructions to counsel prior to charging the jury. (Docket No. 276). The Court's draft final jury instructions directed the jury to consider the parties' evidence and to determine, among other things, whether Brown proved that one or more of the Troopers lacked probable cause to initiate proceedings against him by considering: "whether the facts and circumstances available to each trooper would warrant a prudent officer in believing that the plaintiff had committed or was committing a crime"; whether one or more of the troopers "knowingly or deliberately, or with reckless disregard for the truth, made false statements or omissions that created a falsehood in the affidavit of probable cause and those false statements or omissions were material to the probable cause determination"; and whether any of the Troopers made any "reckless assertion in the affidavit of probable cause" by making a statement of which he or she "entertained serious doubts as to [its] truth" or "accuracy." (*Id.* at 27-29).

After the Court provided the draft instructions to counsel, and gave them time to review the same, and then called them into a charge conference, Brown's counsel *specifically stated* that

there was no objection to the instructions other than an errant typo.[16]  Rule 51(c) addresses how parties are to object to instructions or failure to give instructions and states: "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."  Fed. R. Civ. P. 51(c)(1).  The rule further indicates that parties are to make such objections either at the time that the court gives counsel a chance to object on the record out of the jury's hearing under Rule 51(b)(2) or, if a party has not been informed that a particular instruction will be given and has no opportunity to object, then such party may "object[] promptly after learning that the instruction or request will be, or has been, given or refused."  Fed. R. Civ. P. 51(c)(2).  Additionally, "if an argument is raised in support of a motion *in limine*, the motion is *denied*, and the argument is not restated at the appropriate time, the argument is not preserved under Rules 50 or 51."  *Lightning Lube*, 4 F.3d at 1173; *Collins v. Alco Parking Corp.*, 448 F.3d 652, 656 (3d Cir. 2006) ("[M]erely proposing a jury instruction that differs from the charge given is insufficient to preserve an objection." (quoting *Franklin Prescriptions, Inc. v. New York Times Co.*, 424 F.3d 336, 339 (3d Cir. 2005))).  If no objection is appropriately made, then the courts may consider "plain error" in the instructions if such error "affects substantial rights."  Fed. R. Civ. P. 51(d)(2); *see also Alexander v. Riga,* 208 F.3d 419, 426 (3d Cir. 2000) ("If the party claiming error in the jury instructions did not make a timely objection, we review for plain error and we will reverse only if the trial court committed error that was fundamental and highly prejudicial, such that the instructions failed to provide the jury with

---

[16]    *Court*: "Has everybody had an opportunity to review the proposed instructions that were circulated to you last time we were together?"  *Counsel for Brown*: "Yes."  *Counsel for Trooper*s: "Yes."  *Court*: "… any objections or concerns?"  *Counsel for Brown*: "Page 28, Line 507. . . .  I think you should take out the word 'too.'. . .  No other objections."  (Docket No. 306 at 29).  Counsel for Brown also stated—in response to counsel for the Troopers' request for modification of the instruction on materiality—that he believed "materiality, as far as that is concerned, is where it is supposed to be[.]"  (*Id.* at 32).  Counsel for Brown neither presented any objection to the Court's proposed instruction on fabrication of evidence, nor to the Court's decision to overrule an objection lodged on the fabrication of evidence instruction by counsel for the Troopers.  (*Id.* at 33-35).

28

adequate guidance, and the District Court's refusal to consider the issue would result in a miscarriage of justice.").

Here, it is doubtful even plain error applies where—as the Court has pointed out already—the Court's instructions were in large part premised on the instructions jointly proffered by Brown and the Troopers. In circumstances such as these, where an error is "invited by a party through [his] counsel, even 'plain error' will be deemed waived." *Kerwin v. McConell*, No. CIV.A. 05-93, 2008 WL 4525369, at *5 (W.D. Pa. Sept. 30, 2008) (citing *Brown v. Cost Co.*, No. CIV.A. 03-224 ERIE, 2006 WL 544296, at *2 (W.D. Pa. Mar. 3, 2006)); s*ee United States v. Console*, 13 F.3d 641, 660 (3d Cir. 1993) ("Thus, if there was any error at all, it was 'invited error' and cannot now be a basis for reversal." (quoting *Herman v. Hess Oil Virgin Islands Corp.*, 524 F.2d 767, 772 (3d Cir. 1975)). Brown's argument of error in the instructions is, therefore, waived.

Even assuming Brown's argument of error in the jury instructions was preserved,[17] the Court will still reject Brown's argument that the jury was improperly permitted to consider legal questions. The legal questions that Brown argues were improperly posed to the jury are presented in his motions as follows: "Because this case involves claims of a false affidavit of probable cause in the warrant application, two _legal questions_ must be resolved: First, whether [the Troopers] 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant,'" and "second, whether those false statements or omissions were 'material, or necessary, to the finding of probable cause.'" (Docket

---

[17]    The Court's analysis here covers plain error review that would apply if the Court determined that Brown's challenge of the Court's instruction had been waived but not invited. In assessing the substance of the argument, the Court determines there was no error. As a result, it's further clear that there was no "plain error" that was "fundamental and highly prejudicial." *Collins*, 448 F.3d at 656 (quoting *Franklin Prescriptions*, 424 F.3d at 339).

No. 284 at 13 (quoting *Pinkney v. Meadville*, 95 F.4th 743, 748 (3d Cir. 2024)).[18]  However, the

Third Circuit has specifically held that the question of probable cause in an action for malicious

prosecution is a question that is generally submitted to the jury.  Third Circuit Model Civil Jury

Instructions, 4.13, Section 1983 – Malicious Prosecution (citing *Montgomery v. De Simone,* 159

F.3d 120, 124 (3d Cir. 1998) ("We have held that the question of probable cause in a section 1983

damage suit is one for the jury.  Summary judgment on [the] malicious prosecution claim therefore

is only appropriate if taking all … allegations as true and resolving all inferences in [the plaintiff's]

favor, a reasonable jury could not find a lack of probable cause for [the] stop and arrest." (citing

*Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978))).

In *Patzig*, the Third Circuit explained that while "a magistrate or judge makes probable

cause determinations in the criminal context," in the civil context, the probable cause question is

one for the jury based on historical analogy to the common law action for false arrest or false

imprisonment.  577 F.2d at 848; *see also Halsey v. Pfeiffer*, 750 F.3d 273, 300 (3d Cir. 2014)

("Courts should exercise caution before granting a defendant summary judgment in a malicious

prosecution case when there is a question of whether there was probable cause for the initiation of

the criminal proceeding because, 'generally, the existence of probable cause is a factual issue.'"

(quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)); *James v. Brant*, No.

3:22-CV-106, 2024 WL 23380, at *16 (W.D. Pa. Jan. 2, 2024) (explaining that probable cause in

a Section 1983 suit is generally a question for the jury though there are some cases where the

existence of probable cause may be determined as a matter of law (citing *Montgomery*, 159 F.3d

---

[18]     Brown essentially contends here that the Court should have reconstructed the affidavit of probable cause based on the evidentiary record established at trial, to make a determination—*as a matter of law*—whether there was probable cause to arrest Brown in the early morning hours of February 21, 2009.  (Docket No. 284 at 23 ("To be sure, this process is generally a question of law for the court because it is a legal determination involving the application of legal standards to a reconstructed affidavit to assess probable cause rather than factual ones.")).

at 124, and *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997))).  Notably, in *Dempsey v. Bucknell University*, the Third Circuit discussed at length the "procedure district courts are expected to use when reviewing a probable cause determination underlying a warrant."  834 F.3d 457, 467 (3d Cir. 2016).  In that case, the court explained that the probable cause determination is assessed based on the totality of the circumstances, and stated that such determination is "necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed."  *Id.* at 468.  Of course, that said, a court may nevertheless grant a motion for summary judgment "on the question of probable cause if a court concludes that 'the evidence, viewed most favorably to the nonmoving party, reasonably would not support a contrary factual finding.'"  *Id.* (quoting *Sherwood*, 113 F.3d at 401).[19]

When a district court is tasked with evaluating probable cause in deciding a motion for summary judgment, *Dempsey* instructs it to follow a particular process for evaluating the presence or absence of probable cause.  As such, the district court: (1) "identif[ies] any improperly asserted or omitted facts" and "determines [if] there were reckless misrepresentations or omissions"; and (2) "excise[s] the offending inaccuracies and insert[s] the facts recklessly omitted from the affidavit and assess[es] whether the reconstructed affidavit would establish probable cause."  *Id.* at 469–70.  Contrary to Brown's argument, this process of reconstructing the affidavit does not mean that the probable cause determination itself is a question of law that must be resolved by the Court, rather than a fact-intensive inquiry that is appropriately the province of a jury.  When courts

---

[19]    The Third Circuit has acknowledged the "tension" in evaluating probable cause for purposes of a summary judgment motion because probable cause "allows the existence of conflicting, even irreconcilable, evidence," whereas summary judgment asks "whether there is a 'genuine dispute as to any material fact'" viewing the evidence in the light most favorable to the non-movant.  *Dempsey*, 834 F.3d at 468 (citations omitted).  The Third Circuit explained that viewing the evidence in a light most favorable to the non-movant did not mean excluding any unfavorable facts from the probable cause determination; rather, it means that courts "view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a 'fair probability' that a crime occurred."  *Id.*

are called on to decide dispositive pretrial motions, which were not filed in this case, they are often required to assess evidence, construe that evidence in favor of the non-movant, and then decide whether there are material factual disputes that warrant a trial. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). And, in that procedural context, district courts must perform a word-for-word reconstruction of the affidavit of probable cause as part of their summary judgment analysis per *Dempsey*.[20]

Accordingly, while this Court is authorized in its discretion to consider whether the jury's conclusions from the evidence presented at trial warrant a new trial, the Court disagrees with Brown's contention that the Court was required to decide: (1) whether the Troopers made any knowing, deliberate, or reckless, false statements in or omissions from the Affidavit as a matter of law; and (2) whether the putative false statements or omissions were material, again, as a matter of law; and then, based on such determinations, should have directed the jury to find that there was no probable cause to arrest Brown and that there had been fabrication of Jenessa's statement. Brown cites cases that he would say show that the Court improperly referred inherently legal

---

[20]    Judge-made analytical tools can have "amorphous bounds." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 320 (2025) (Thomas, J., concurring). The Third Circuit's affidavit reconstruction requirement in *Dempsey* arose in the context of reviewing a district court's evaluation of a motion for summary judgment. 834 F.3d at 466 ("On appeal, Dempsey contends that the District Court erred in granting summary judgment on his false arrest, malicious prosecution, false imprisonment, and supervisory liability claims."). Within that context, the Third Circuit considered the legal standards governing "probable cause and the procedure district courts are expected to use" in evaluating the probable cause "underlying a warrant." *Id.* at 467. The Third Circuit explained that the "probable cause determination" "eschew[s] any rigid demand that specific tests be satisfied" and that such "determination is necessarily fact-intensive, and … will usually be appropriate for a jury to determine." *Id.* (citations omitted). However, on a motion for summary judgment involving a probable cause question—where, as indicated above, the summary judgment standard asks if there are any genuine questions of material fact but the underlying probable cause determination "allows for the existence of conflicting, even irreconcilable, evidence"—the Third Circuit explained that courts should "perform literal, word-by-word reconstructions of challenged affidavits" of probable cause to "facilitate[] [appellate courts'] review of the district court's determination as to the existence of probable cause." *Id.* at 478-70. In *Dempsey*, the Third Circuit made it clear that this review-facilitating practice was indeed a *rule* for district courts to follow. *Id.* at 470. Though Brown advocates for the *Dempsey* rule to be incorporated into jury instructions, this Court declines to extend the reconstructed-affidavit requirement beyond its original function as a tool for reviewing district courts' summary judgment decisions.

questions to the jury;[21] however, the cases cited by Brown show that this Court did not err in allowing the jury to answer the question of whether probable cause existed to arrest. That is, neither the cases cited by Brown (*Pinkney*, *Wilson*, *Andrews*, *Reedy*, *Bracey v. Betancourt*, *McLee v. Brown*, etc., *see* discussion of these cases, *infra*)—nor any others the Court has found—establish a precedent under which it is mandatory that trial courts evaluate the evidence presented in a malicious prosecution jury trial, reconstruct an affidavit of probable cause for the jury, and then present the same to the jury as an instruction or direct the jury that the court has determined that a reconstructed affidavit shows a lack of probable cause and that their factfinding is cabined to other elements of a malicious prosecution claim. For instance, in *Pinkney*, the Third Circuit asked whether a defendant officer accused of doctoring a statement for the affidavit of probable cause (1) knowingly, deliberately, or with reckless disregard, made false statements or omissions that created a falsehood in the warrant, and (2) whether such false statements or omissions were material to the finding of probable cause. 95 F.4th at 748. The Third Circuit asked such questions in the context of reviewing the district court's denial of the officer's motion to dismiss and viewing any facts in the light most favorable to the plaintiff in that matter. *Id.* at 747.

In *Wilson v. Russo*, the Third Circuit reviewed the district court's award of summary judgment to the defendant upon a determination that the defendant officer's misstatements and omissions in that case were not material, so the right to be free from arrest except upon probable cause was not violated. 212 F.3d 781, 783 (3d Cir. 2000). In *Wilson*, the Third Circuit considered the two questions Brown discusses above (whether defendants knowingly/deliberately/recklessly

---

[21]    Docket No. 284 at 23 ("To be sure, this process [of reconstructing the affidavit of probable cause based on the undisputed evidentiary record here and then deciding whether probable cause exists as a matter of law] is generally a question of law for the court because it is a legal determination involving the application of legal standards to a reconstructed affidavit to assess probable cause rather than factual ones.").

made false statements or omissions that created a falsehood and whether such false statements or omissions were material) and explained that its inquiry was: "whether [the plaintiff] adduced sufficient evidence *that a reasonable jury* could conclude that [the defendant] made statements or omissions that he 'knew were false, or would have known were false except for his reckless disregard of the truth.'" *Id.* at 787 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). In adding the statements and omissions back into the affidavit of probable cause to determine materiality, the Third Circuit ultimately concluded that the district court had correctly decided that "no reasonable jury could find facts that would lead to the conclusion that" the "'corrected' warrant lacked probable cause." *Id.* at 792.

In *Andrews v. Scuilli*, the Third Circuit considered a case in which the district court had awarded the defendant officer summary judgment on the basis of qualified immunity. 853 F.3d 690, 694 (3d Cir. 2017). The Third Circuit reversed and remanded the case for a trial. *Id.* In its decision, the court explained that "the reconstructed affidavit shows substantial evidence of the witness' own unreliability that could outweigh Wagner's positive identification. This question must be resolved by the fact finder." *Id.* at 705. In *Reedy v. Evanson*, the Third Circuit considered the district court's award of summary judgment to defendants, determined that viewing the facts in the light most favorable to the plaintiff, "no reasonably competent officer could have concluded … there was probable cause for the arrest," and "vacate[d] and remand[ed]" the unlawful seizure, false imprisonment, and malicious prosecution claims against one of the defendant police officers "to go to a jury." 615 F.3d 197, 232 (3d Cir. 2010). In *Bracey v. Betancourt*, the district court denied the defendant's summary judgment motion on the plaintiff's malicious prosecution claim. No. CV 20-6205, 2021 WL 5112246, at *6 (E.D. Pa. Nov. 3, 2021). And, *McLee v. Brown* involved cross motions for summary judgment filed by the plaintiff and defendant-Troopers where,

in analyzing the motions, the Court reconstructed the affidavit of probable cause and determined that there was not probable cause for the arrest and that malice could not be determined as a matter of law; therefore, both parties' motions were denied, and it appears the case went on to settle before trial.   Civ. Action No. 18-1630, 2021 WL 916651 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted by* 2021 WL 914340 (W.D. Pa. Mar. 10, 2021) (*see* Civ. Action No. 18-1630 Order filed at Docket No. 93).   These cases did not involve application of the *Dempsey* reconstructed-affidavit requirement to district courts' composition of appropriate jury instructions at trial.

If district courts are required to engage in the analysis explained in *Dempsey* (and set forth in *Wilson*) not only at summary judgment, but also *at trial*, such a directive is not known to this Court.   As things now stand, the Court does not read *Wilson* and *Dempsey* and their progeny so broadly as to apply in circumstances other than those in which a district court, rather than a factfinder, determines "the existence of probable cause."   *Dempsey*, 834 F.3d at 470.   Here, where the parties did *not* file motions for summary judgment, much more needed to be determined by the jury, including whether, factually, information was inserted into or omitted from the Affidavit with at least reckless disregard for the truth.   Accordingly, at trial, the Court instructed the jury as follows:

> AS TO THE THIRD ELEMENT [of a malicious prosecution claim], A PLAINTIFF MUST PROVE THAT ONE OR MORE OF THE TROOPERS LACKED PROBABLE CAUSE TO INITIATE THE PROCEEDING AGAINST HIM.
> …
>
> IN THIS CASE, JORDAN BROWN ALLEGES THAT THOUGH HE WAS ARRESTED PURSUANT TO A WARRANT, HIS ARREST NEVERTHELESS VIOLATED THE FOURTH AMENDMENT BECAUSE THE WARRANT WAS NOT SUPPORTED BY PROBABLE CAUSE.   **THAT AN ARREST WARRANT IS ISSUED BY A JUDGE WHO DETERMINES**

**THERE IS PROBABLE CAUSE TO ARREST BASED ON AN AFFIDAVIT OF PROBABLE CAUSE DOES NOT SHIELD AN OFFICER FROM LIABILITY IF, IN PREPARING THE AFFIDAVIT OF PROBABLE CAUSE, A LAW ENFORCEMENT OFFICER KNOWINGLY AND DELIBERATELY, OR WITH RECKLESS DISREGARD FOR THE TRUTH, MADE FALSE STATEMENTS OR OMISSIONS THAT CREATED A FALSEHOOD IN THE AFFIDAVIT OF PROBABLE CAUSE AND THOSE FALSE STATEMENTS OR OMISSIONS WERE MATERIAL TO THE PROBABLE CAUSE DETERMINATION**. AN OFFICER MAKES A RECKLESS ASSERTION IN THE AFFIDAVIT OF PROBABLE CAUSE WHEN VIEWING ALL THE EVIDENCE, THE AFFIANT MUST HAVE ENTERTAINED SERIOUS DOUBTS AS TO THE TRUTH OF HIS OR HER STATEMENTS OR HAD OBVIOUS REASONS TO DOUBT THE ACCURACY OF THE INFORMATION HE OR SHE REPORTED. IT IS NOT ENOUGH TO SHOW NEGLIGENCE OR INNOCENT MISTAKE BY THE OFFICER.

LAW ENFORCEMENT OFFICERS ARE NOT EXPECTED TO PRESENT EVERY DETAIL IN AN INVESTIGATION TO A JUDGE IN AN AFFIDAVIT OF PROBABLE CAUSE. BUT THEY ARE NEITHER PERMITTED TO DISREGARD PLAINLY EXCULPATORY EVIDENCE AND INCLUDE ONLY THOSE DETAILS THAT SUPPORT A FINDING OF PROBABLE CAUSE. **IF AN OFFICER WITHHOLDS FACTS THAT HE OR SHE KNOWS AND THAT A REASONABLE PERSON WOULD HAVE KNOWN WAS THE KIND OF THING A JUDGE WOULD WISH TO KNOW, THEN THE OFFICER HAS MADE A RECKLESS OMISSION FROM THE AFFIDAVIT OF PROBABLE CAUSE.**

(Docket No. 276 at 27-30). This instruction resembles instructions given by other courts in

malicious prosecution civil rights actions that went to trial.[22] Indeed, here, evidence and argument

---

[22]    For instance, Brown cites *Round v. City of Philadelphia* prominently in his arguments about the reliability or inherent unreliability of child statements. In *Round*, the court considered a case wherein there were "serious allegations of sexual assault made by two young children," charges against Round and an arrest by officers at the Philadelphia Police Department, and a subsequent dismissal of the criminal case against Round, after which Round sued the Philadelphia police officers for unlawful arrest and malicious prosecution in violation of his Fourth Amendment rights via 42 U.S.C. § 1983. No. CV 19-3513, 2022 WL 2916681, at *2 (E.D. Pa. July 22, 2022). At the time of the decision by the district court in *Round*, the court considered one of the defendant officers' motions for summary judgment. *Id.* The district court denied that motion after determining that a reasonable jury could find the defendant officer lacked probable cause to arrest Round and that the officer was not covered by qualified immunity. *Id.* Round had alleged, like Brown here, that the officer lacked probable cause for his arrest and omitted material

was presented to the jury at trial concerning whether the Troopers made knowing, deliberate, or reckless false statements or omissions in seeking a warrant for Brown's arrest, alongside evidence including the Troopers' explanation of their decisions in the investigation that led to Brown's arrest. The Court therefore finds no error that would warrant a contrary verdict or new trial on the malicious prosecution claim in this case.

      ii.     *Whether the No-Liability Verdict for Malicious Prosecution Warrants a New Trial*

Though the Court has determined there was no error in its submitting the probable cause and malicious prosecution questions to the jury, under Rule 59 the Court may consider whether the jury's verdict conflicts with the evidence presented to the jury. In this case, before the jury was tasked with deliberating on the Troopers' liability for malicious prosecution and fabrication of evidence, Brown presented to the jury approximately twenty items and argued that those items were material to the probable cause determination. In doing so, Brown's counsel wrote the items

---

information from the affidavit of probable cause. *Id.* at 10. The district court followed the three-step analysis established by the Third Circuit in *Wilson*, 212 F.3d at 786-87, to assess whether omissions created a falsehood and such statements were material to the finding of probable cause. *Id.* at 11. For purposes of the motion, the district court reconstructed an affidavit of probable cause and, from it, determined that "a reasonable jury could find that the reconstructed affidavit lacked probable cause to arrest." *Id.* at 16. For that reason, the district court determined there were unresolved questions of material fact precluding summary judgment, and that in "evaluating the totality of the circumstances, a jury may find that the omitted information in the reconstructed affidavit was material to the probable cause determination and outweighs the inculpatory facts therein." *Id.* at 19.

After the motion for summary judgment in *Round* was denied, the case continued to trial. *See Round*, EDPA, No. 19-3513 (Docket No. 72 *et seq.*). At the end of the trial, the district court instructed the jury concerning whether Round had been deprived of a federal constitutional right, specifically his "Fourth Amendment right to be free from unreasonable seizure." (*Round*, No. 19-3513, Docket No. 167 at 148). Like this Court, the district court in *Round* instructed the jury that it was the jury's job to "determine whether Officer Madgey had probable cause based upon the totality of the facts and circumstances known to [her] at the time of the arrest." (*Id.* at 151). The district court further instructed the jury that Round had alleged "that defendant obtained the warrant by making omissions that created a falsehood in the warrant affidavit." (*Id.* at 152). Next, the district court instructed the jury that Round "must prove each of the following" by a preponderance: "First, in the warrant affidavit, defendant made false statements or omissions that created a falsehood"; "Second, defendant made those false statements or omissions either deliberately or with reckless disregard for the truth"; "Third, those false statements or omissions were material or necessary to the finding of probable cause for the arrest warrant." (*Id.*). The district court went on: "To determine whether misstatements or omissions were material, you must subtract the misstatements from the warrant affidavit and add the facts that were omitted and then determine whether the warrant affidavit with these corrections would establish probable cause." (*Id.* at 153). Thus, the *Round* court's instructions paralleled those employed in the trial here.

on a white board for the jury's consideration.  Brown also includes those items in his pending

motion.  (Docket No. 284 at 20-21).  Brown's list includes evidence that before Jenessa implicated

Brown in Ms. Houk's death after midnight on February 21st, Jenessa had provided "exculpatory"

statements and an "alibi" for Brown when interviewed by the Troopers twice earlier on February

20, 2009, first at 11:30 a.m., and then at 8:40 p.m.  (*Id.* at 20).  Brown also posits that omitted

material evidence includes: that Jenessa was interviewed several times prior to Brown's arrest;

that there was no apparent reason she changed her story from not noticing anything out of the

ordinary that morning to hearing a "big boom"; that Jenessa said she "messed up" when telling her

story; that Jenessa said her mom and her dad (who was not home that morning) had told Brown to

move his guns around the house the day of her death; that Jenessa's midnight statement was

"confusing" to the Troopers as she was giving it; that Brown had no known motive prior to his

arrest; the short (approximate two-minute) timeline in which Brown would have had to complete

his crime if Jenessa's story was to be believed; that Ms. Houk's phone was in bed with her before

the children left for school but was on the  dresser when her body was found (suggesting she was

alive when they left); that the armoire where Brown was supposed to have retrieved ammunition

was closed; that Jenessa reported no threats from Brown; that Jenessa and Brown had a good

relationship; and that any searches of Brown's school, bus, etc., prior to his arrest were negative

for evidence.  (*Id.* at 20-21).

    In effect, Brown presented the jury with a de facto reconstructed affidavit of probable cause

through testimony, demonstrative exhibits, and argument.  It was the jury's job as factfinder to

determine whether, as Brown alleged and argued, "a warrant application based on what [the

Troopers] should have told the judge would have *lacked* probable cause."  *Wilson*, 212 F.3d at

786.  Having considered the evidence that was presented to the jury at trial on omissions from the

Affidavit, the Court cannot say that the jury's verdict regarding the Troopers' liability for malicious prosecution shocked the conscience, *i.e.*, is a "miscarriage of justice." *Marra v. Philadelphia Hous. Auth*., 497 F.3d 286, 309 n. 18 (3d Cir. 2007). The evidence presented to the jury no doubt showed that, in preparing the Affidavit to submit to the judge for Brown's arrest, the Troopers did not include all the fruits of their investigation at that time. The Troopers did not discuss their earlier interviews of Jenessa at school and in the middle of the evening, nor how such interviews had not yielded the same information as the midnight interview and Jenessa's statement about a "big boom." The Affidavit did not refer to the number of interviews the Troopers took of Jenessa that first day or the circumstances surrounding why Jenessa—a young child—was at the PSP barracks after midnight when giving her final statement implicating Brown in her mother's death. The Troopers did not include in the Affidavit that Jenessa said she "messed up" at one point as she gave her statement, nor that they were confused by her statement about who (her mom or dad) had told Brown to move his guns around the house and where the guns were just before Jenessa and Brown left for school (downstairs or upstairs). Other contextual facts for a hypothetical timeline of Brown's purported commission of the crime, such as the placement of Ms. Houk's cellphone, whether Brown appeared to have a motive, and Brown's relationship with his soon-to-be stepsisters were also left out of the Affidavit. Considering those and other omissions and the Troopers' explanations for their statements and omissions along with credibility determinations, the jury decided that the Troopers had not, at least, recklessly disregarded the truth in drafting the Affidavit, that is, they did not "viewing all the evidence … entertain[] serious doubts as to the truth of [their] statements or [have] obvious reasons to doubt the accuracy of the information reported." *Pinkney v. Meadville*, 648 F. Supp. 3d 615, 641 (W.D. Pa. 2023) (internal quotation marks and citation omitted), *aff'd*, 95 F.4th 743 (3d Cir. 2024).

Information is recklessly omitted when an officer withholds facts that they know and that "any reasonable person would have known … was the kind of thing the judge" issuing the warrant "would wish to know." *Id.* (internal quotation marks and citation omitted). The demands of the Fourth Amendment are a balancing act in that "[a]ll storytelling involves an element of selectivity." *Wilson,* 212 F.3d at 787. Courts do not interpret the Fourth Amendment to require that law enforcement officers "relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip." *Id.* Officers are not permitted to "make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence" because that would defeat the point of a neutral probable cause determination. *Id.* That's why the courts settle on a reasonableness standard, *i.e.*, require law enforcement officers to include information that a "reasonable person would have known … was the kind of thing the judge would wish to know." *Id.* (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

The Court will not disturb the jury's determination that the asserted omissions in evidence were not something that a reasonable person would know is the type of thing the judge would want to know. Omitted negative facts included: that the Troopers did not include a reason why Jenessa included a "big boom" in her midnight statement but not in earlier statements; there was no explanation for Jenessa being at the PSP barracks to give a statement after midnight; the Troopers had not yet discovered a motive; and there were no indications that Brown had a bad relationship with Ms. Houk or his stepsisters-to-be. The Court cannot fault the jury to the extent that such omissions were not found by the jury to be the type of omissions to support a malicious prosecution verdict. As for other omissions, including Jenessa's statements earlier in the day which indicated

40

the day started as normal, that is, did not implicate Brown, the number of times Jenessa was interviewed, Jenessa's statement that she messed up her story, Jenessa's testimony that her parents told Brown to move his guns around the house that day, that Jenessa's story was confusing, that a theory of the case pursuant to which Brown committed the crime would mean the timeline had to be extremely short (around two minutes), that Ms. Houk's phone was no longer in her bed when her body was discovered, that the armoire with ammunition was closed, and that forty-five minutes were unaccounted for after the children left for school, such omissions could be found to be knowing or reckless omissions.  However, in the Court's view, Brown did not show any such omissions were material such that the jury's verdict was against the weight of the evidence or a miscarriage of justice.  The question here is whether, with that additional information, the neutral magistrate would have had "[p]robable cause" for issuance of an arrest warrant, that is, that the magistrate could have relied on such information to believe there was a "'fair probability' that [Brown] committed the crime at issue." *Wilson*, 212 F.3d at 789.  In this case, even if the Affidavit had included information indicating that in Jenessa's prior statements she did not mention the "big boom," that Jenessa indicated she "messed up" or that her statement was confusing, and that the timeline for commission of the offense would have had to be very short for Brown to have committed the crime of which he was accused, it is reasonable to determine that the judge's issuance of a warrant was based on probable cause.  *See Dempsey*, 834 F.3d at 479 (explaining that no reasonable jury could have found a lack of probable cause even though certain witness statements favorable to the plaintiff were omitted because probable cause does not require a resolution of all conflicts in evidence).  The Court is confident that the verdict does not shock the conscience for purposes of Rule 59, and therefore the Court declines to exercise its discretion to order a new trial.  Additionally, even if this Court were reviewing the evidence under the more

demanding Rule 50 standard, *see Whelan v. Teledyne Metalworking Prods.*, No. CA 01-1316, 2006 WL 39156, at *8 (W.D. Pa. Jan. 6, 2006), *aff'd*, 226 F. App'x 141 (3d Cir. 2007); *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1185 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir. 1993),[23] the Court would arrive at the same outcome, upholding the verdict.

C.    Whether Child-Interviews Undermined the Verdict

Next, Brown argues that the Court should have recognized and instructed the jury that uncorroborated child statements are inherently unreliable as a matter of law. (Docket No. 284 at 29 ("At a minimum, a new trial should include instructions about what evidence was required to be in the affidavit of probable cause" including "legal instructions concerning child witness statements.")). Specifically, Brown points to parts of the summary judgment decision in *Round* in which the district court in that matter assessed materiality of information omitted from an affidavit of probable cause and issues arising from the officers' reliance on "allegations of young victim witnesses that were not corroborated by other witnesses or physical evidence." 2022 WL 2916681, at *16. In *Round*, the district court explained that the "Third Circuit has never directly addressed this issue," but "other circuits have found that serious concerns exist when basing probable cause entirely on the uncorroborated statements of young children." *Id.*[24]

First, to the extent that Brown suggests the reliability of child witness statements should be the subject of an instruction to the jury—"At a minimum, a new trial should include … legal instructions concerning child witness statements" (Docket No. 284 at 29)—Brown never objected

---

[23]    *Cf. Wagner by Wagner, 49 F.3d at 1017* (citing *Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987) ("[A] verdict can be against the 'great weight of the evidence', and thus justify a new trial, even if there is substantial evidence to support it." (quoting *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir.1982)))).

[24]    In this case, the probable cause determination was not entirely based on the statements of young children but, according to the Affidavit, was also based on the Troopers' determination that Ms. Houk's gunshot wound was consistent with a 20-gauge shotgun shell and the only 20-gauge shotgun found in the residence belonged to Brown. (Docket No. 285, Ex. 16).

to the lack of such an instruction(s); therefore, it was not properly preserved and should be reviewed now only for plain error. Fed. R. Civ. P. 51(d).    The Court detects no such error here. Rather, this Court allowed Brown to present evidence and argument to the jury on the reliability of child witness statements—most importantly, the credibility and reliability of the child witnesses at issue *in this case*—for evaluating the totality of the circumstances upon which probable cause was based here.    Accordingly, at trial, Brown proffered the expert testimony of Joanna Collins. Ms. Collins testified that while serving in the United States Air Force, she attended George Washington University and earned her Master's Degree in forensic sciences with a concentration in crime scene investigations.    (Docket No. 300).    She studied child abuse investigations, among other things.    (*Id.*).    Ms. Collins testified that, after she received her degree, she was an overseas regional forensic science consultant and, in that role, she conducted child forensic interviews. (*Id.*).    She later was promoted to a position overseeing the forensic science program for the Air Force Office of Special Investigations.    (*Id.*).    She indicated that she was trained in child forensic interviewing and that child interviewing is a specialty because children are not "little adults" and must be interviewed accordingly.    (*Id.*).    She testified that when interviewing a child, it's best to use non-leading, non-suggestive questioning in a "neutral environment" where the child is comfortable.    (*Id.*).    She also testified that—ideally—it's best to "just do one interview" but there is "follow-up information" that sometimes develops that justifies a "continuation interview."    (*Id.*). She testified that children's needs, *e.g.*, napping, also affects child interviews.    (*Id.*).    Ms. Collins also testified about concepts including "source monitoring" and "interviewer bias," which she described as discerning how an interviewee knows what they know and that an interviewer can have thoughts or theories that lead them to ask some questions or pursue some theories to the exclusion of others.    (*Id.*).    She also discussed the concept of "core facts."    (*Id.*).    Additionally, Ms.

Collins testified regarding the concept of "suggestibility," which is the idea of suggesting an answer one is looking for by how a question is phrased. As an expert in this case, Ms. Collins had reviewed documents from the crime scene and related to the child interviews that took place on February 20 and 21, 2009. (*Id.*). Ms. Collins was questioned about these interviews and, regarding Jenessa's interview after midnight, Ms. Collins was asked whether the interview was "reliable." (*Id.*). Ms. Collins responded that the interview opened up a lot of questions. She indicated that based on her review of the documents, there could have been interviewer bias based on the "very focused" nature of the after-midnight interview. (*Id.*).

In addition to Ms. Collins's expert testimony, the jury was presented audio evidence of the midnight Jenessa interview, along with substantial testimony about the other interviews that took place on February 20th, from which the jury could evaluate the credibility and reliability of Jenessa's inculpatory statement on February 21, 2009. At trial, the Court instructed the jury that they were to be the sole judges of credibility of witnesses and that any factors bearing on believability could be factored into their consideration of credibility of witness statements. Moreover, the Court also notes that Jenessa's age at the time of her interview was included in the Affidavit, so the judge evaluating whether there was probable cause to arrest Brown could factor Jenessa's young age into his consideration of the credibility of her statement. (Docket No. 285, Ex. 16 ("A known 7-year-old female … who resides in the same residence as the victim and the defendant, was interviewed")). Accordingly, the Court will not find error, let alone error affecting substantial rights, by not instructing the jury that Jenessa's statement should have been disregarded as a matter of law. Nor will the Court find that child statements, generally, are so inherently unreliable that the consideration of such statements so undermined the evidence on which the jury

relied to an extent that the verdict is unsupported by the evidence or is a miscarriage of justice in light of the evidence. *Davis*, 153 F. Supp. 2d at 600 (explaining the Rule 59 standard)).

D.    The Fabrication of Evidence Determination

Brown also argues that the Court should have instructed the jury that, as a matter of law, the Troopers fabricated evidence to arrest him. (Docket No. 284 at 29 ("This Court should also decide as a matter of law that Defendants fabricated evidence to arrest Jordan Brown because no reasonable jury could conclude anything differently.")). The Court interprets this argument two ways, the first way being that Brown is arguing that the question of liability for fabrication of evidence is a legal determination that the Court—rather than a jury—must make. The second is that Brown is arguing that the jury's no-liability verdict for fabrication of evidence was unreasonable and a miscarriage of justice in light of the evidence that was presented at trial. The Court will address both aspects of the argument.

i.    *Whether the Court Erred in Instructing the Jury on Fabrication of Evidence*

As to the first, in *Halsey,* the Third Circuit explained that a plaintiff has a stand-alone due process claim when a law enforcement officer fabricates "known false evidence" and "forward[s] [it] to prosecutors." 750 F.3d at 293. In a Section 1983 claim for fabrication of evidence, the harm to be redressed is the corruption of the process "regardless of the outcome at trial or the particular time in the proceeding that the corruption occurs." *Black v. Montgomery Cnty.*, 835 F.3d 358, 371 (3d Cir. 2016), *as amended* (Sept. 16, 2016). To prevail on a fabrication of evidence claim, a plaintiff must show a fabrication of evidence that was "so significant that it could have affected the outcome of the criminal case" and was not merely "incorrect or simply disputed." *Halsey*, 750 F.3d at 295. A plaintiff must show a "reasonable likelihood" that without the fabricated evidence he would not have been criminally charged, the "reasonable likelihood" standard being "based on

45

principles of causation" and the necessity of there being a "meaningful connection" between the fabricated evidence and the due-process injury. *Black*, 835 F.3d at 372. A fabrication-of-evidence plaintiff must also show that "the proponents of the evidence" are either "aware that evidence is incorrect or that the evidence is offered in bad faith." *Id.*

Before trial, Brown filed a motion asking the Court to read the following instruction to the jury on the issue of fabrication of evidence:

> You are directed that Mr. Brown has met all the elements of a claim for fabrication of evidence. That is to say that … without the use of fabricated evidence, Mr. Brown would not have been criminally charged for the deaths of Kenzie Houk and her unborn fetus. Therefore, you are only to consider this claim to decide the amount of damages that you might award Mr. Brown[.]

(Docket Nos. 98, 98-1 at 3). The Court denied that motion without prejudice. (Docket No. 116). In denying the motion, the Court explained that by making that motion Brown effectively sought partial summary judgment (without having filed such a motion and without the benefit of a robust evidentiary record as is required pursuant to Fed. R. Civ. P. 56), and that the record before the Court at that time—eight months prior to trial—was not adequate for a summary judgment determination. (Docket No. 117 at 72-73).

Closer to trial, Brown and the Troopers filed their joint *Proposed Jury Instructions on Liability (Phase I)* for malicious prosecution and fabrication of evidence, discussed *supra*, Section III(B)(i). (Docket No. 134). In their proposal for an instruction on fabrication of evidence, the parties agreed upon an instruction to the jury indicating that Brown had the burden of proving that the Troopers knew that the evidence they offered to the magisterial district judge in the Affidavit "was incorrect or that the evidence [was] offered in bad faith"—bad faith meaning "knowing or willful submission of false evidence, or evidence offered with a reckless disregard for the truth"— as well as other relevant legal principles pertaining to fabrication of evidence. (*Id.* at 12-13).

Consistent with the contours of the due process right not to be charged or convicted upon fabricated evidence, the Court ultimately instructed the jury that they should find in Brown's favor for his fabrication of evidence claim if the evidence supported "a conclusion that the proponents of the evidence knew that it was incorrect or that the evidence [was] offered in bad faith," with bad faith including any "knowing or willful submission of false evidence, or evidence offered with a reckless disregard for the truth." (Docket No. 276 at 32-33). The Court also instructed that, to prevail on a fabrication of evidence claim, Brown had to "prove that there is a reasonable likelihood that, without the use of the fabricated evidence, [he] would not have been criminally charged," and that the fabricated evidence "was so significant that it could have affected the outcome of the criminal case." (*Id.* at 33).

Nothing in *Halsey* or its progeny indicates that such instruction was deficient or that this Court should have gone one step further to instruct the jury that the Troopers altered Jenesssa's statement when inserting an edited version of it in the Affidavit to an extent that they effectively falsified her statement. The Court appropriately defined the contours of Brown's Fourteenth Amendment right to be free from initiation of criminal charges based on fabricated evidence, and permitted the jury to consider whether Brown had carried his burden as to the elements of fabrication of evidence for each Defendant Trooper. The Court therefore finds no legal error in permitting the jury to consider these questions. And, the Court additionally notes that it instructed the jury consistent with the jury instructions that were jointly proposed by the parties prior to trial and without objection from Brown at the charge conference or in the course of the instructions being given, as the Court has discussed, *supra*, Section III(B)(i). Therefore, the Court finds no error that would justify a new trial under Rule 59's standard for trial errors.

ii.    *Whether the Verdict of No-Liability for Fabrication of Evidence Requires a New Trial*

Next, the Court addresses Brown's argument that a new trial is warranted where the jury returned a verdict in the Troopers' favor for fabrication of evidence, even though the Troopers admitted at trial that they would not have been able to arrest Brown without "doctoring Jenessa Houk's recorded statement." (Docket No. 284 at 27). The evidence of fabrication that Brown presented to the jury in this case is largely based on the Troopers' use of ellipses to condense Jenessa's full midnight statement to the portions of the statement that the Troopers included in the Affidavit. Brown argues that the Troopers' editing was so significant that, in its final form, it constituted de facto fabrication. Brown argues that Jenessa's statement, as presented in the Affidavit, takes the statement (reproduced in full, *supra*, Section I) and makes it look like Jenessa said something she did not say. Jenessa's actual statement included the following:

> [M]y mom yelled up the stairs and I said "okay." Then, then, then I went in and woke Jordan up. Then he went downstairs and I got dressed. Then he got his clothes and he went in the bathroom, and then he got dressed. Then, then, then like, about like five minutes after that, my mom said—I was by the door and he was getting his socks on. My mom said um (pause) he went upstairs and got the guns, then he came downstairs…. No, no, I, I messed up. I messed up….
>
> So he went up to—he went—my dad said that he went up—my dad told him to go up and get the guns and bring them down, but he put 'em, brang 'em back up, and then he got his socks on. My mom said, "You better go." And then, and then, he was still in there getting' his socks on and then I went and got my shoes on, and then I was standing there and I heard a big boom. And I don't—he, then he asked me—and I asked him what it was and he didn't; he didn't tell me. So then we went down to the bus stop….
>
> (TPR Wilson: Okay, when you heard the big boom, could you see Jason—er—Jordan?) No. (TPR Wilson: No. He came in the room after that?) Yeah. (TPR Wilson: Okay, and just so we have it clear—'cause it got—I'm a little bit confused again. Tell me again about the guns.) He went up and got 'em, then he brung 'em back

down.  Then he went up again and put 'em back upstairs, and then
he came down, got his socks on; then he came—I was already ready;
then, then, before he came to get his shoes on I heard a big boom
and I didn't know what it was.  And I came—he came in here, and I
was like "Jordan, what was that?  What was that noise?"  And he
said, "I don't know what it was—what it was," so then he went—
then I and Jordan—we went down to the driveway.

(TPR McGraw: Jenessa, a little bit ago, when [Trooper Wilson]
wasn't in here what did you say that big boom sounded like?)  A
gun.  (TPR McGraw: Okay, and and how do you know what a gun
sounds like?)  Because I've heard a gun before….  When my dad
and my mom—when my dad and my brother were shootin' outside.

That statement was edited in the manner below, to such an extent that Brown argues

amounts to falsification:

~~[M]y mom yelled up the stairs and I said "okay." Then, then, then I went in and woke Jordan up.  Then he went downstairs and I got dressed.  Then he got his clothes and he went in the bathroom, and then he got dressed.  Then, then, then like, about like five minutes after that, my mom said—I was by the door and he was getting his socks on.  My mom said um (pause).~~ He went upstairs and got the guns, then he came downstairs …. ~~No, no, I, I messed up.  I messed up…. So he went up to—he went—my dad said that he went up—my dad told him to go up and get the guns and bring them down, but he put 'em, brang 'em back up, and then he got his socks on.  My mom said, "You better go." And then,~~ … and then, and then, he was still in there getting his socks on then I went and got my shoes on and then I was standing there and I heard a big boom ~~… And I don't—he, then he asked me—~~I asked him what it was and he didn't tell me; ~~he didn't tell me.  So then we went down to the bus stop….~~ ~~(TPR Wilson: Okay, when you heard the big boom, could you see Jason—er—Jordan?)~~ *Subsequent to being asked if she could see Jordan when she heard the big boom, [Jenessa] stated*: No.  ~~(TPR Wilson: No.  He came in the room after that?)~~ *Subsequent to being asked if Jordan came in the room after she heard the big boom, [Jenessa] stated:* Yeah.  ~~(TPR Wilson: Okay, and just so we have it clear—'cause it got—I'm a little bit confused again.  Tell me again about the guns.)  He went up and got 'em, then he brung 'em back down.  Then he went up again and put 'em back upstairs, and then he came down, got his socks on; then he came—I was already ready; then, then, before he came to get his shoes on I heard a big boom and I didn't know what it was.  And I came—he came in here, and I was like "Jordan, what was that?  What was that noise?"  And he~~

said, "I don't know what it was—what it was, so then he went—then I and Jordan—we went down to the driveway." (TPR McGraw: Jenessa, a little bit ago, when Jan wasn't in here what did you say that big boom sounded like?) *She was also asked what she had said the big boom sounded like, and she replied,* A gun. (TPR McGraw: Okay, and and how do you know what a gun sounds like?) *When asked how she knew what a gun sounded like, she replied,* Because I've heard a gun before…. When my dad and my mom—when my dad and my brother were shootin' outside. [Jenessa] also stated that earlier that morning she observed [Jordan] carry his two guns downstairs and then carry them back upstairs.

As the Court has explained above, for his fabrication of evidence claim, Brown had to prove by a preponderance of the evidence that the Troopers "willfully, knowingly or recklessly formulated or submitted false evidence." *Natividad v. Raley et al.,* No. CV 22-5061, 2025 WL 1550740, at *6 (E.D. Pa. May 30, 2025) (citing *Mervilus v. Union Cnty.*, 73 F.4th 185, 194 (3d Cir. 2023)). The jury was presented with the entirety of Jenessa's statement, including audio of her midnight statement, they heard the Troopers' explanation for what they included in the Affidavit, and they were instructed on the law for fabrication of evidence, before deciding that Jenessa's statement was not fabricated. The Troopers omitted information from Jenessa's original statements and, in doing so, made her statement appear more linear and confident than it was. The editing of her statement also made it seem more likely that one or more guns were downstairs at the time Brown was alleged to have shot Ms. Houk. That said, the Troopers accounted for their edits to Jenessa's statement by using ellipses and other indicia of abbreviation, showing the magisterial district judge who reviewed the Affidavit that it did not contain Jenessa's full statement word-for-word. From this evidence, the jury could have reasonably determined that the Troopers were, if anything, negligent but not reckless in their submission of Jenessa's statement as it appears in the Affidavit and the possibility that it could have been misinterpreted. *See Mervilus*, 73 F.4th at 195 (deciding a reasonable jury could find fabrication by an officer when "viewing the evidence

in the light most favorable to [the plaintiff], [the officer] had reason to doubt his [polygraph] method's validity and reliability, used biased techniques to examine [the plaintiff], and rendered a conclusion not compelled by the data").  This Court will not displace the jury's determination of whether each Trooper recklessly, knowingly, or willfully formulated a false narrative where, for instance, the Troopers edited Jenessa's statement to make it more direct in some ways, but also included conflicting information in it, like noting that Jenessa had observed Brown carrying guns back upstairs at the end of their account of her statement.  Additionally, as the Court explained, *supra*, Section III(B)(ii), if the Court had not found Brown's Rule 50 motion to be waived, the Court would nevertheless reject Brown's argument concerning sufficiency of the evidence for purposes of Rule 50 for substantially the same reasons that warrant denial of Brown's Rule 59 motion in this respect.  The Court cannot say that, in light of the evidence of fabrication and the testimony at trial, the jury's verdict is unsupported or that it was a miscarriage of justice for the jury to find no liability for fabrication of evidence based on the Troopers' editing of Jenessa's statement from its original form to what appeared in the Affidavit.

      E.    <u>Whether the Court Erred in Allowing Jenessa's Testimony at Trial</u>

The last of Brown's arguments is that he is entitled to a new trial because the Court allowed Jenessa to give testimony as an adult at trial, which largely pertained to matters unknown to the Troopers before Brown's arrest, *i.e.*, information and evidence discovered after Brown's arrest that the parties were forbidden from drawing out in testimony under the Court's ruling on motions in limine.  Brown argues that allowing Jenessa's testimony was highly prejudicial, but the problem with such argument is, again, preservation.  The Third Circuit has held that "if a party files an unsuccessful motion *in limine* seeking the exclusion of certain evidence, that party need not formally object at trial when the evidence in question is introduced *if two conditions are satisfied*:

51

(1) the party filed a written pre-trial motion setting forth reasons and case citations in support of the request that the evidence be excluded; and (2) the district court made a 'definitive' ruling with no suggestion that it would reconsider the matter at trial." *Walden v. Georgia-Pac. Corp.*, 126 F.3d 506, 518 (3d Cir. 1997). The second of those preconditions was not satisfied here with respect to Jenessa's trial testimony, so it was important for Brown to object to Jenessa's testimony if he believed her to be testifying on irrelevant or highly prejudicial matters at trial. This he did not do.

Brown moved to preclude the testimony of Jenessa in several motions in limine. In the first (Docket No. 82), Brown argued that "testimony from Jenessa Houk about her recollection of events and/or interactions with law enforcement from February 20 to 21, 2009, is irrelevant" because the "case is about the nature of the affidavit of probable cause used to arrest Mr. Brown." (Docket No. 83 at 4). Brown further argued in his motion in limine that whatever "Jenessa Houk presently recalls about her interactions and statements to law enforcement is irrelevant." (*Id.*). Plaintiff also cited the risk of prejudice in his motion. (*Id.* at 5). The Court denied that motion *without prejudice* on July 23, 2024. (Docket No. 125). Brown then moved to strike the Troopers' designations of Jenessa Houk's deposition testimony. (Docket No. 158). He argued that her testimony could not be designated and read to the jury as evidence because she was available to testify live at trial. (Docket No. 159). The Troopers withdrew their designations and the Court denied the motion to strike as moot. (Docket No. 168). Brown then filed a new motion in limine to preclude Jenessa's testimony. (Docket No. 179). This time, he argued that the police reports and audio from February 20th and 21st were the best evidence of "what Jenessa Houk said during the criminal investigation." (Docket No. 180 at 1). Brown further argued that "present testimony from Jenessa Houk about her recollection of events on February 20, 2009, is irrelevant and highly prejudicial." (*Id.* at 3).

At Oral Argument, the Court explained it would take the motion under advisement and gave inclinations that included the following:

> In my view what is principally relevant in the liability phase is what the Defendants knew when they executed [and submitted] the affidavit of probable cause…. That informs me then to conclude that any interactions or interviews between the Defendants and the witnesses that are part and parcel to what led to the affidavit of probable cause is relevant. If this particular witness gets on the stand and says, "I don't remember what I told them," that's the testimony. And then the jury can weigh that. If she gets on the stand and says, "I do remember certain things about it, and this is what I remember," then the Plaintiff has an opportunity to impeach that based upon deposition testimony.

(Docket No. 301 at 72-73). The Court went on: "To the extent, however, that this particular witness or other witnesses are proffered to testify about their general recollections of that day, outside of what it was they told the Defendants, I'm not sure that is relevant…. I'm not prepared to rule on that here, but that's my inclination. . . . So let that guide your preparations, and we can revisit this if need be . . . I'll defer ruling on that motion." (*Id.* at 73-74). Subsequently, the Court denied that motion but stated that such denial was "without prejudice to any supported objection(s) at trial for the reasons outlined on the record at Oral Argument on 11/7/2024." (Docket No. 230). This much is clear from argument and the order on the motion: there was no "definitive" ruling on Jenessa's testimony that relieved Brown from his responsibility of raising all appropriate objections to her testimony at trial. Despite this, no objection to Jenessa's testimony on the basis now asserted was raised at that time. A party who thus "fails to object to errors at trial waives the right to complain about them following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998). Moreover, Brown himself testified at trial in such a way that he could have been subjected to the same argument that he raises now concerning Jenessa's live testimony, since Brown testified at trial about how February 20, 2009, was different from a typical day, and about his recollection of

interactions with Jenessa and Ms. Houk that day. (Docket No. 292 at 119-27). Brown was therefore not prejudiced by Jenessa's testimony when he had the opportunity to testify in much the same manner as Jenessa on the events of February 20, 2009. In fact, his testimony in this regard preceded Janessa's testimony. For these reasons, the Court will not order a new trial because Jenessa was permitted to testify at trial.

## IV.  **CONCLUSION**

For all these reasons, Brown's MOTION for Judgment as a Matter of Law or in the alternative, MOTION for New Trial (Docket No. 283) is <u>DENIED</u>.


Dated:  September 25, 2025                    *<u>s/ W. Scott Hardy</u>*
                                             W. Scott Hardy
                                             United States District Judge

cc/ecf: All counsel of record